

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-15-1997

# Suber v. Chrysler Corporation

Precedential or Non-Precedential:

Docket 95-5735

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

## Recommended Citation

"Suber v. Chrysler Corporation" (1997). *1997 Decisions.* Paper 14.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/14

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

95-5735

_____

JAMES SUBER,

Appellant

v.

CHRYSLER CORPORATION

v.

KONTINENTAL KOACHES,INC., a/k/a and d/b/a
KONTINENTAL KONVERSIONS,

Third-party defendant

CHRYSLER CORPORATION,

Third-party plaintiff

_____

On Appeal from the United States District Court
For the District of New Jersey
D.C. Civ. No. 94-cv-00467

_____

Argued: July 25, 1996

Before: BECKER, STAPLETON, and MICHEL, Circuit Judges*

(Opinion Filed January 16, 1997)

_____

ROBERT M. SILVERMAN, ESQUIRE (ARGUED)
Cynthia M. Certo, Esquire
Kimmel & Silverman
630 Sentry Park
Suite 310

_____

* The Honorable Paul R. Michel, United States Circuit Judge
for the Federal Judicial Circuit, sitting by designation.

1

Blue Bell, PA    19422

Counsel for Appellant

KEVIN M. MCKEON, ESQUIRE (ARGUED)
Marshall, Dennehey, Warner,
 Coleman & Goggin
Three Greentree Center
Suite 304
Marlton, NJ    08053-3405

Counsel for Appellee

_____

OPINION OF THE COURT
_____


BECKER, Circuit Judge.

This appeal in a "Lemon law" case presents the question whether the district court erred in dismissing for lack of subject matter jurisdiction the claims of the plaintiff, James Suber, brought against Chrysler Corporation on account of alleged defects in the 1993 Dodge Ram 250 Conversion Van that he purchased from a Chrysler dealership, Cherry Hill Dodge.  The district court held that Suber's claims failed to meet the $50,000 amount in controversy requirement of the federal diversity statute, 28 U.S.C. § 1332, inasmuch as: (1) the New Jersey Consumer Fraud Act was inapplicable, rendering Suber ineligible for the treble damages that are available under that statute; and (2) Suber's remaining claims did not satisfy the jurisdictional requirement.

We review the dismissal of Suber's complaint for failure to establish subject matter jurisdiction, hence we consider only whether plaintiff's claims, taken as true, allege

2

facts sufficient to invoke the jurisdiction of the district court.  Licata v. U.S. Postal Serv., 33 F.3d 259, 260 (3d Cir. 1994).  Because we find that the district court dismissed the complaint without properly evaluating Suber's claims under the prevailing standard of St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283 (1938), we vacate and remand for further proceedings.

## I. Facts[1]

Suber purchased the Dodge van from Cherry Hill Dodge ("the dealership") on April 28, 1993.[2]  Prior to Suber's purchase, Kontinental Koaches, Inc., a third-party defendant, renovated the van, installing new seats, carpeting, upholstery, a sofa, and other accessories.  The sticker price of the car, with these improvements, was approximately $29,895.00.  Almost immediately after taking possession, Suber discovered problems with the van, especially its suspension.  In particular, the van had a tendency to "bottom out," even on relatively smooth road surfaces.

Suber avers that he returned the van to the dealer at least four times over the course of several months.  When he returned the van on May 10, 1993, he complained of the "bottoming out," as well as a harsh ride, steering drift, and other defects.  One week later, on May 17, 1993, he complained about the van's

---

[1]The facts are drawn from Suber's complaint, Suber's deposition testimony, and the briefs and accompanying exhibits submitted pursuant to Chrysler's motion for summary judgment.

[2]It is unclear from the record whether Cherry Hill Dodge is owned by Chrysler or is privately owned.

suspension, steering, brakes, driver's seat, rear door handle, electrical system, and the running boards. The dealership told Suber that nothing was wrong with the van, but balanced the tires.

Because the problems with his van persisted, Suber returned to the dealership on June 9, 1993 with the same complaints. The dealership serviced the van, by aligning the front end and balancing the wheels, but again told Suber that there was nothing wrong. A few weeks later, on or around June 25, 1993, the van "bottomed out" so severely that it caused one of the front tires to go flat. Suber had the tire replaced on his own, without returning to the dealership.

On June 28, 1993, Suber filed a claim with the Customer Arbitration Board ("CAB"), an informal dispute resolution body established by Chrysler under the New Jersey Lemon Law, N.J.S.A 56:12-36. Pursuant to CAB procedures, a Chrysler representative, George Bomanski, and a dealership employee inspected and road tested the van. According to Suber, both men told him that there was a problem with the van's suspension. However, the official report filed by Bomanski stated that the suspension system was fine. By letter dated August 5, 1993, the CAB found that Suber's complaint regarding the suspension was groundless, and it denied Suber's request for a refund of the purchase price because "the use, value and safety of [the] vehicle has not been substantially impaired."[3]

_____

[3]The CAB did rule that Chrysler was responsible for repairing the door panel, handle, and exterior trim, and performing an oil usage test. It also ruled, however, that the

4

According to Suber, the suspension problems persisted through July 1993. The van failed Pennsylvania motor vehicle inspection at that time because of its suspension, including "obviously compressed front springs." Additionally, Suber claims that he returned the van to the dealership on two occasions when the dealership did not supply him with a copy of the repair invoice.

On July 16, 1993, Suber again left the van with the dealership for service. This appears to be the same day that he met with Bomanski and the dealership employee for the CAB inspection. The dealership told him that it would contact him when the repairs were completed. On August 16, 1993, having heard nothing, he called and was informed that his van was not yet ready. He went to the dealership and found his van parked in the back lot. The dealership's repair invoices show that the last work on the van was performed on July 22, 1993.

Subsequent to Suber's last repair attempt, Chrysler sent to owners of 1993 and 1994 Dodge Ram Vans and Wagons, including Suber, a "Customer Satisfaction Notification." This notice informed these Dodge owners that the front coil springs on their vehicles needed to be replaced:

> The service is needed to prevent the front suspension from bottoming out when traveling over rough surfaces. Without the service we are offering, the vehicle identified on the enclosed form may exhibit a harsh ride or suspension noises. We ask that you arrange for this important service without delay.

_____

other alleged defects either did not exist or were not the result of a Chrysler manufacturing defect. App. 305A.

In conjunction with this notice, Chrysler sent to its dealers a "Technical Services Bulletin" dated September 3, 1993 that detailed the repair work necessary to correct suspension problems like those experienced by Suber.

Suber contends that his van's suspension is defective to this day, and that the van has never passed the Pennsylvania inspection. A mechanic retained by Suber's counsel inspected the car on March 2, 1995 and found that the suspension system was in an "extremely dangerous condition" and that the car was unsafe to drive. In response, Chrysler points out that Suber has continued to drive the van. At the time of the CAB inspection in July 1993, the van had 5057 miles on it. When a Chrysler representative road tested the van on March 13, 1995, it had 16,514 miles on it. The Chrysler representative concluded that the van has no suspension problems.

## II. Procedural History

Suber filed a complaint against Chrysler in the District Court for the District of New Jersey, alleging violations of the New Jersey Automobile Lemon Law, N.J.S.A § 56:12-29 et seq.; the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq.; the New Jersey Uniform Commercial Code, N.J.S.A. § 12A:1-101 et seq.; and the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 et seq. ("NJCFA"). Suber alleged that the district court had subject matter jurisdiction under the diversity statute because the amount in controversy exceeds $50,000.[4] Soon after the complaint was filed, the district court

---

[4]The Magnuson-Moss Warranty Act requires that the amount in

6

considered sua sponte whether it had subject matter jurisdiction and issued an Order to Show Cause. The plaintiff responded by letter, and the court withdrew the order. Chrysler then moved for summary judgment, asserting that the evidence could not support Suber's legal claims.

On September 5, 1995, the district court sua sponte dismissed Suber's complaint for lack of subject matter jurisdiction, Fed. R. Civ. P. 12(b)(1), holding that the amount in controversy did not exceed $50,000. Relying on a New Jersey Appellate Division decision, D'Ercole Sales, Inc. v. Fruehauf Corp., 501 A.2d 990 (N.J. Super. Ct. App. Div. 1985), the court held that the "New Jersey Consumer Fraud Act, which contains a mandatory treble damage provision, is inapplicable to the case at bar," Mem. Op. at 3-4, because Suber failed to "provide [the district court] with evidence of defendant's allegedly unconscionable conduct or 'substantial aggravating circumstances' surrounding defendant's alleged breach of the express warranties." Id. at 3. Under D'Ercole Sales, breach of warranty without substantial aggravating circumstances is not actionable as a NJCFA claim.

Having found that Suber could not rely on the treble damages available under the NJCFA to meet the amount in controversy requirement, the court stated that it was satisfied "to a legal certainty" that Suber's remaining claims could not exceed the $50,000 barrier. Id. at 4. It reasoned that the

controversy exceed $50,000 to establish federal jurisdiction, even though it is a federal provision. 15 U.S.C. § 2310(d).

maximum amount that the plaintiff could recover under either the Magnuson-Moss Warranty Act or the Lemon Law is the full refund price of the vehicle if found defective, $29,895.00.  The court noted that attorney's fees should be included, but stated that these fees would have to exceed $20,105.00 to get to the jurisdictional amount, which it held would be clearly excessive.  Id.

Suber has filed a timely appeal, contending primarily that the district court failed to apply the proper test for determining the amount in controversy.  Our review of the order dismissing the complaint is plenary.  See Packard v. Provident Nat'l Bank, 994 F.2d 1039, 1044 (3d Cir.), cert. denied sub nom. Upp v. Mellon Bank, N.A., 510 U.S. 964 (1993).

### III.  The Amount in Controversy Requirement

For a plaintiff to establish federal diversity jurisdiction, the amount in controversy must exceed $50,000, exclusive of interest and costs.  28 U.S.C. § 1332(a).  The standard for determining whether a plaintiff's claims satisfy the amount in controversy requirement was set out by the Supreme Court in St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283 (1938), as follows:

> The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.

Id. at 288-89 (emphasis added) (footnotes omitted); see also

8

Nelson v. Keefer, 451 F.2d 289, 292-93 (3d Cir. 1971). In applying the "legal certainty" test established by St. Paul Mercury, this Court has stated that "dismissal is appropriate only if the federal court is certain that the jurisdictional amount cannot be met." Columbia Gas Transmission Corp. v. Tarbuck, 62 F.3d 538, 541 (3d Cir. 1995); cf. Lunderstadt v. Colafella, 885 F.2d 66, 69-70 (3d Cir. 1989) (holding in a federal question case that "a federal court may dismiss for lack of jurisdiction only if the claims are 'insubstantial on their face'").

Once a good faith pleading of the amount in controversy vests the district court with diversity jurisdiction, the court retains jurisdiction even if the plaintiff cannot ultimately prove all of the counts of the complaint or does not actually recover damages in excess of $50,000. St. Paul Mercury, 303 U.S. at 288. Accordingly, the question whether a plaintiff's claims pass the "legal certainty" standard is a threshold matter that should involve the court in only minimal scrutiny of the plaintiff's claims. The court should not consider in its jurisdictional inquiry the legal sufficiency of those claims or whether the legal theory advanced by the plaintiffs is probably unsound; rather, a court can dismiss the case only if there is a legal certainty that the plaintiff cannot recover more than $50,000. As we stated in Lunderstadt, the "threshold to withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(1) is thus lower than that required to withstand a Rule 12(b)(6) motion." Lunderstadt, 885 F.2d at 70; Batoff v. State Farm Ins.

9

<u>Co.</u>, 977 F.2d 848, 852 (3d Cir. 1992).

The temporal focus of the court's evaluation of whether the plaintiff could conceivably prevail on its claim is on the time that the complaint was filed. While courts generally rely on the plaintiff's allegations of the amount in controversy as contained in the complaint, "where a defendant or the court challenges the plaintiff's allegations regarding the amount in question, the plaintiff who seeks the assistance of the federal courts must produce sufficient evidence to justify its claims." <u>Columbia Gas</u>, 62 F.3d at 541. We have also held that "the record must clearly establish that after jurisdiction was challenged the plaintiff had an opportunity to present facts by affidavit or by deposition, or in an evidentiary hearing, in support of his jurisdictional contention." <u>Berardi v. Swanson Memorial Lodge No. 48 of the Fraternal Order of Police</u>, 920 F.2d 198, 200 (3d Cir. 1990) (<u>quoting</u> <u>Local 336, American Federation of Musicians, AFL–CIO v. Bonatz</u>, 475 F.2d 433, 437 (3d Cir. 1973)); <u>see also</u> 5A Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1350, at 213–18 (2d ed. 1990).

The question whether there is a legal certainty that Suber's claims are for less than $50,000 depends on what damages Suber could conceivably recover under New Jersey state law, and we must therefore consider the applicable New Jersey statutes and Suber's allegations under them.

### IV. <u>The New Jersey Lemon Law</u>

The New Jersey Lemon Law provides a remedy to consumers who purchase defective vehicles, as Suber claims he has. Under

10

this law, if a consumer reports a "nonconformity" in a vehicle to the manufacturer or its dealer during the first 18,000 miles or within two years of the date of delivery to the consumer, the manufacturer must make, or arrange with the dealer to make, the necessary repairs "within a reasonable time."  N.J.S.A. 56:12-31.  The statute defines a "nonconformity" as a "defect or condition which substantially impairs the use, value or safety of a motor vehicle."  Id. 56:12-30.  According to the New Jersey courts, whether a defect rises to the level of an actionable nonconformity depends on whether it "shakes the buyer's confidence" in the goods.  See Berrie v. Toyota Motor Sales, U.S.A., Inc., 630 A.2d 1180, 1182 (N.J. Sup. Ct. App. Div. 1993).  Thus, if a "reasonable person" in Suber's position could conclude that the "bottoming out" "impairs the use and value of the car and shakes [his] confidence in it," then the suspension problems with Suber's van qualify as nonconformities.  Id. at 1183.

If the manufacturer or dealer is unable to correct the nonconformity within a reasonable time, the vehicle is a true "lemon" and the owner is entitled to damages.  The law presumes that a manufacturer is unable to correct a nonconformity within a reasonable time if the owner has made three or more unsuccessful repair attempts or the vehicle "is out of service by reason of repair for one or more nonconformities" for a total of twenty days.  N.J.S.A. 56:12-33.

We find that Suber has sufficiently alleged that the use and value of his van are impaired such that we cannot

conclude that the alleged suspension problems could not conceivably be found to constitute nonconformities. Suber stated in his affidavit that the van has never passed the Pennsylvania inspection test, and a mechanic he hired has stated that it is unsafe to drive. Chrysler recalled all 1993 Dodge Ram vans and wagons for the same defect, even while the dealership contended that there was nothing wrong with the van. Suber has also alleged that his van presumptively cannot be fixed: in his affidavit, he stated that he has made more than three repair attempts and that the vehicle remained out of service for repairs for more than 20 days. When his complaint was filed, then, it was conceivable that Suber's van was a true "lemon" and that he was entitled to recovery.[5]

If successful on his Lemon Law claims, Suber could recover the full refund value of the car plus collateral damages, mainly finance charges. The statute provides:

> The manufacturer shall provide the consumer with a full refund of the purchase price of the original motor vehicle including any stated credit or allowance for the consumer's used motor vehicle, the cost of any options or other modifications arranged, installed, or made by the manufacturer or its dealer within 30 days after the date of original delivery, and any other charges or fees including, but not limited to, sales tax, license and registration fees, finance charges . . . less a reasonable allowance for vehicle use.

_____

[5]There is evidence that shows that Suber's van has been driven for over 16,000 miles, calling into question Suber's claims that his car is valueless. However, considering such evidence is not proper at the jurisdictional stage, unless that evidence suggests that the amount in controversy allegations were not made in good faith. We conclude that this evidence does not make it certain that Suber could not prevail on his Lemon Law claim.

12

<u>Id.</u> 56:12-32 (emphasis added).

Moreover, in calculating the amount in controversy, we must consider potential attorney's fees. Although 28 U.S.C. § 1332 excludes "interest and costs" from the amount in controversy, attorney's fees are necessarily part of the amount in controversy if such fees are available to successful plaintiffs under the statutory cause of action. <u>See</u> <u>Missouri State Life Ins. Co. v. Jones</u>, 290 U.S. 199 (1933). They are here. <u>See</u> N.J.S.A. 56:12-42 ("In any action by a consumer against a manufacturer brought in Superior Court or in the division pursuant to the provisions of this act, a prevailing consumer shall be awarded reasonable attorney's fees, fees for expert witnesses and costs.").

The district court began and ended its inquiry with the sticker price of the van, which was $29,895. Because we have concluded that it is conceivable that Suber's van is a total "lemon," we agree that Suber is entitled to include the entire sticker price of the van in the amount in controversy. Without considering potential collateral charges, however, the district court dismissed the complaint because the attorney's fees that would be available to Suber if he prevailed could not get him over $50,000. The district court erred, therefore, in not considering the collateral charges, particularly finance charges, as part of the amount in controversy.

The question before us, then, is how to calculate Suber's collateral charges for purposes of the amount in

13

controversy inquiry.  According to Suber, his total Lemon Law damages are $40,015.20.  As stated on his contract with the dealership, sales tax and registration fees bring the cost of the van to $31,649.  Once finance charges are added, Suber alleges that the total cost of the van is $41,404.20.[6]  As calculated by Suber, the reasonable allowance for use that is required to be deducted pursuant to the Lemon Law is $1,389.10, which brings the total to $40,015.20.[7]  If Suber's allegation is correct, attorney's fees necessary to get him above the $50,000 threshold might not be unreasonable.

However, in considering Suber's claimed amount in controversy, we are given pause by his contention that he is entitled to count the total finance charges stated in the financing agreement toward the amount in controversy.  We find this unlikely.  Suber would pay the total charges if it took him the entire finance period to pay for the van, but not if he paid off the car loan before that time.  Under New Jersey law, a borrower may prepay a retail installment sales loan in full at

---

[6]Suber financed $26,779.11.  With an 8.5% interest rate, his total finance charges are $8595.21.  Suber's down payment, which included cash, a rebate, and the value of his trade-in, was $6029.88.  Added together, this brings the total price as stated in the Retail Sales Installment Contract to $41,404.20.
   The amount financed includes optional credit life insurance that totals $1085.99.

[7]Under N.J.S.A. 56:12-30, the reasonable allowance for vehicle use is calculated by multiplying the purchase price by the mileage at the time the consumer first presents the vehicle to the dealer for repair of the nonconformity and dividing that number by 100,000 miles.  In this case, if $41,404.20 is multiplied by 3,355 (the mileage at the time of the first suspension complaint), and then that is divided by 100,000, the result is $1,389.10.

14

any time and obtain a credit for unaccrued interest.  N.J.S.A. 17:16C-43.  If, for example, Suber had made his car payments for three months, and then decided to pay the remaining principal on his loan, the only finance charges he would pay would be the interest included in the three payments that he made.  He would be entitled to a refund for the remaining, unpaid finance charges.  Concomitantly, had Suber been awarded Lemon Law damages by the district court after making three car payments, his damages would include only those finance charges that he had paid.  See, e.g., Gambrill v. Alfa Romeo, Inc., 696 F. Supp. 1047, 1048 (E.D. Pa. 1988) (calculating damages under Pennsylvania Lemon Law).[8]  Accordingly, it seems to us that Suber will be entitled to recover in this action only those finance charges that he has paid at the time of the judgment.

The question of how to determine finance charges for the purposes of the amount in controversy requirement is thus a difficult one that involves a measure of speculation.  We have held that the amount in controversy should not be "measured by the low end of an open-ended claim, but rather by a reasonable reading of the value of the rights being litigated." Angus v. Shiley Inc., 989 F.2d 142, 146 (3d Cir. 1993).  Because the district court failed to make this determination with respect to the finance charges that Suber can include in the amount in controversy, it erred in concluding that there is a legal

---

[8]The same is true for the credit life insurance that Suber financed.  He would be entitled to a refund of the unaccrued premiums upon prepayment of the loan.  N.J.S.A. 17:16D-14.

15

certainty that Suber's claims are for less that $50,000.

We thus will vacate the district court's order and will remand the case so that the court can determine whether Suber's Lemon Law claim allows him to establish diversity jurisdiction. In making this determination, the district court should consider the purchase price of the van, all collateral charges, and potential attorney's fees. As Suber's van is conceivably a total "lemon," the district court should start with the purchase price, $29,895, and add to it sales tax and registration fees, which bring the total to $31,649. The district court must then determine the amount of any finance charges and attorneys' fees includable in Suber's amount in controversy.

## V.   New Jersey Consumer Fraud Act

We now turn to the New Jersey Consumer Fraud Act ("NJCFA") to determine whether Suber can satisfy the amount in controversy requirement under that law. The NJCFA allows private plaintiffs to bring suit if they are harmed by an unconscionable commercial practice. See, e.g., Cox v. Sears Roebuck & Co., 647 A.2d 454, 460-61 (N.J. 1994). Under the NJCFA, the:

> act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J.S.A. 56:8-2. If a defendant is found to have committed an

16

unconscionable commercial practice, the statute imposes mandatory treble damages and attorney's fees.  Id. 56:8-19.

Suber also relies on the NJCFA to establish subject matter jurisdiction.  He submits that he has sufficiently alleged that Chrysler committed unconscionable commercial practices within the meaning of the NJCFA and that he can, therefore, include possible NJCFA damages in the amount in controversy, in particular, the treble damages that are available under that statute.

The district court rejected this contention and held that there is a legal certainty that Suber cannot recover under the NJCFA.  It concluded that Suber has not alleged any facts that could constitute a NJCFA violation because Suber's only claim is for breach of warranty, which is not actionable under the NJCFA.  The court, relying on the New Jersey Appellate Division case, D'Ercole Sales, Inc. v. Fruehauf Corp., 501 A.2d 990 (N.J. Super. Ct. App. Div. 1985), held that Suber has failed to allege "substantial aggravating circumstances," which New Jersey law requires to recover for a breach of warranty.

Although the New Jersey Supreme Court has approved of certain language from D'Ercole Sales, see Cox, 647 A.2d at 462, it has never directly considered the issue before the D'Ercole Sales court and thus has never explicitly adopted its holding. In D'Ercole Sales, the court held that a truck assembler's failure to honor the warranty was not an "unconscionable consumer practice" within the meaning of the NJCFA.  In so holding, the court stated that "a breach of warranty, or any breach of

contract, is not per se unfair or unconscionable, and a breach of warranty alone does not violate a consumer protection statute." 501 A.2d at 998 (citations omitted).  While acknowledging that a breach of warranty is unfair to the non-breaching party, it stated that:

> "[i]n a sense, unfairness inheres in every breach of contract when one of the contracting parties is denied the advantage for which he contracted, but this is why remedial damages are awarded on contract claims.  If such an award is to be trebled, the . . . legislature must have intended that substantial aggravating circumstances be present."

Id. at 1001 (emphasis added) (quoting United Roasters, Inc. v. Colgate-Palmolive Co., 649 F.2d 985, 992 (4th Cir. 1981)). Because this holding seems unexceptionable, uncontroversial, and altogether sensible, we predict that D'Ercole Sales would be followed by the New Jersey Supreme Court, and hence we find that the District Court correctly concluded that the NJCFA requires that substantial aggravating circumstances be shown when the basis for the NJCFA claim is breach of warranty.

Assuming, therefore, that a plaintiff needs to show substantial aggravating circumstances to prevail under the NJCFA with what is essentially a breach of warranty claim, we conclude that the district court incorrectly held that Suber has not alleged sufficient aggravating circumstances to prevail at the jurisdictional stage.[9]  Suber has made allegations that, if

---

[9]Because we cannot determine from the record whether Chrysler owns the dealership, we consider only those allegations of unconscionable practices made against Chrysler directly.

proven, could constitute substantial aggravating circumstances, such that we cannot find that recovery is precluded to a legal certainty. For example, in his affidavit, Suber states that George Bomanski, a Chrysler representative, told Suber that the van had suspension problems, but his official report, on which the CAB based its decision, noted that there were no suspension problems. Moreover, Suber's allegations that Chrysler knew of the problem are supported by the Technical Services Bulletin, which stated that all 1993 and 1994 Dodge Ram vans and wagons needed repair to correct the suspension problem about which Suber complained.

At all events, we find that Suber's NJCFA claim appears to be premised on more than mere breach of warranty. The Lemon Law has defined certain practices as per se unlawful within the meaning of the NJCFA. In particular, each time a motor vehicle is returned for examination or repair during the first 18,000 miles of operation or within two years of purchase, "the manufacturer through its dealer shall provide to the consumer an itemized, legible statment of repair." N.J.S.A. 56:12-34 (b). Failure to comply with this provision constitutes an unlawful practice under the NJCFA. Id. 56:12-34 (c). Suber testified in his deposition that he left the dealership without receiving repair invoices on at least two occasions.

It thus appears that Suber may not be precluded to a legal certainty from recovering under the NJCFA. Even though we have explained that the court should include the treble damages available under the NJCFA in calculating the amount in

19

controversy, we are uncertain as to what his NJCFA damages would be. The New Jersey Consumer Fraud Act (NJCFA) allows private plaintiffs to recover for any "ascertainable loss" from an allegedly unconscionable practice, N.J.S.A. 56:8-2 & 56:8-19, and imposes mandatory treble damages and attorney's fees, id. 56:8-19. Suber contends that his Lemon Law damages of $40,015.10 are also his NJCFA damages and should be trebled to arrive at $120,045.30 in damages. That seems unlikely to us. Unfortunately, the New Jersey Supreme Court has provided little guidance about quantifying ascertainable loss under the NJCFA. Because we have already determined that a vacatur and remand is appropriate in this case, the remand will also permit the district court to calculate Suber's potential NJCFA damages and thus determine whether there is a legal certainty that the claim is for less that $50,000, once those damages are trebled.

On remand, the court must also determine whether Suber's claims can be aggregated. The general rule is that claims brought by a single plaintiff against a single defendant can be aggregated when calculating the amount in controversy, regardless of whether the claims are related to each other. Snyder v. Harris, 394 U.S. 332, 335 (1969) ("Aggregation has been permitted . . . in cases in which a single plaintiff seeks to aggregate two or more of his own claims against a single defendant."); see also 1 James Wm. Moore, Moore's Federal Practice ¶ 0.97, at 907-08 (2d ed. 1995); 14A Charles Alan Wright et al., Federal Practice and Procedure § 3704 (2d ed. 1985). Based on this general rule, we think that Suber's Lemon Law and

20

NJCFA claims can probably be aggregated. We are given pause, however, by our understanding that these two claims could not be aggregated if Suber could not recover damages for both. That is, if these claims are alternative bases of recovery for the same harm under state law, Suber could not be awarded damages for both, and a court should not aggregate the claims to arrive at the amount in controversy.

We think it is likely that the harms sought to be remedied by the Lemon Law and the Consumer Fraud Act are, in fact, qualitatively different: the Lemon Law seeks to put a consumer in as good a position as he or she would have been in had he or she not purchased the "lemon," while the NJCFA remedies the particular "ascertainable loss" suffered by a consumer by reason of an unconscionable commercial practice. This understanding has also informed our conclusion, explained above, that Suber's potential "ascertainable loss," for purposes of the NJCFA, is probably not the value of the van. On the other hand, we are not entirely confident of these conclusions, and we were cited to no New Jersey courts addressing this question (nor have we found any). But this issue was not briefed by the parties, and they may find some cases. At all events, since we remand here, we leave the aggregation question in the first instance to the district court upon remand.

## VI. Conclusion

For the foregoing reasons, we will vacate the judgment and remand this case to the district court to determine, applying the standard of St. Paul Mercury Indemnity Co. v. Red Cab Co.,

21

303 U.S. 283 (1938), whether there is a legal certainty that Suber's claims are for less than $50,000. Upon remand, the district court must give Suber the opportunity to develop the record in support of his jurisidictional claim, whether through affidavits, depositions, or an evidentiary hearing. In remanding this case to the district court, we note that the district court will also need to consider the availability of diversity jurisdiction under Suber's U.C.C. or Magnuson-Moss Act claims,[10] as well as whether Suber's Lemon Law and NJCFA claims can be aggregated in calculating the amount in controversy.

For the foregoing reasons, the judgment of the district court will be vacated and the case remanded for further

---

[10]Under the Magnuson-Moss Warranty Act ("Magnuson-Moss"), 15 U.S.C. § 2301 et seq., a consumer who is damaged by the failure of a dealer or manufacturer to comply with a warranty obligation can file suit to recover the purchase price plus collateral damages. Id. § 2310(d). Although it is a federal provision, federal jurisdiction under Magnuson-Moss is limited to those cases in which the amount in controversy exceeds $50,000. Id. § 2310(d)(3)(B).

Despite the similarities of this provision to the Lemon Law, whether a plaintiff satisfies the amount in controversy threshold is a different question under Magnuson-Moss. Section 2310(d)(3) expressly excludes "interests and costs" from the calculation of the amount in controversy. Unlike the federal diversity statute, the courts that have considered whether attorney fees are costs within the meaning of the statute have uniformly concluded that they are and thus must be excluded from the amount in controversy determination. See, e.g., Boelens v. Redman Homes, Inc., 748 F.2d 1058, 1069 (5th Cir. 1984); Saval v. BL Ltd., 710 F.2d 1027, 1033 (4th Cir. 1983); Mele v. BMW of North America, Inc., No. 93-2399, 1993 WL 469124, at *3 (D.N.J. Nov. 12, 1993).

Although Suber could therefore probably not establish jurisdiction with his Magnuson-Moss claim, we leave that question to the district court upon remand. If the district court finds that Suber has established diversity jurisdiction with his Lemon Law or NJCFA claim, the court can exercise supplemental jurisdiction over the Magnuson-Moss Act claim. 28 U.S.C. § 1367(a).

proceedings consistent with this opinion.  The parties shall bear their own costs.