NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 09-3029 & 09-3133
_____

PROFESSIONAL CLEANING AND INNOVATIVE
BUILDING SERVICES, INC.

v.

KENNEDY FUNDING INC;
GREGG WOLFER; JEFFREY WOLFER;
JOSEPH WOLFER; KEVIN WOLFER

> Professional Cleaning and Innovative
> Building Services, Inc.,
> > Appellant at No. 09-3029
>
> Kennedy Funding Inc.,
> > Appellant at No. 09-3133

_____

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil Action No. 05-cv-02384
(Honorable William J. Martini)
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
October 4, 2010
Before: SCIRICA, FUENTES and JORDAN, *Circuit Judges.*

(Filed : November 29, 2010)
_____

OPINION OF THE COURT
_____

SCIRICA, *Circuit Judge*.

Plaintiff Professional Cleaning and Innovative Building Services, Inc. entered into a financing agreement with Defendant Kennedy Funding Inc. expecting to receive a loan in the amount of $1,800,000. After two appraisers provided similarly discounted valuations of the collateral property upon which the loan amount would be based, however, Kennedy offered Professional slightly less than $1,500,000. Professional claims Kennedy understood the methods used by the appraisers would leave the calculation of the final loan amount significantly beneath what Professional both anticipated and needed but nonetheless induced Professional to part with significant non-refundable fees. Professional's final complaint advanced six causes of action. The District Court granted Kennedy and the individual Defendants summary judgment on four claims and then dismissed the matter, finding Professional was legally certain to fall short of the minimum amount in controversy needed to endow the federal courts with subject matter jurisdiction in a diversity case. We will affirm.

I.

Professional, a Missouri corporation that engages in the purchasing, leasing and maintenance of commercial property, identified a desirable piece of real estate in Bonner Springs, Kansas in early 2004. Urgently in need of a loan to secure the property, it contacted Kennedy, through a broker, seeking to obtain financing. Kennedy is a New Jersey based "hard money lender" that provides financing to companies with time-sensitive needs. The following month, Kennedy sent Professional a letter of interest in

which it indicated it would make a five-year loan for up to 60% of the "as is market value" of the real estate collateral that would secure the loan. The letter defined "as is market value" as "a three (3) to four (4) month sale to a cash buyer." Professional paid Kennedy a $10,000 fee and, shortly thereafter, received a draft loan commitment. The proposed agreement reiterated the definition of "as is" market value and outlined the process whereby the value of the collateral property would be determined. According to the agreement, Kennedy would select an appraiser of its choosing to render the initial valuation. If Professional was disenchanted with the result, it could, at its own expense, obtain a third-party valuation from a mutually-agreed-upon appraiser.

On April 9, 2004, Professional CEO Brenda Wood called Kennedy CEO Gregg Wolfer. Wood claims Wolfer assured her Professional would receive the desired financing if the collateral was appraised in excess of the $3,100,000 amount Professional believed it to be worth. On April 12, Professional sent Kennedy a letter seeking clarification on several terms, including payment for travel expenses, billing for legal services, and the refundability of the $10,000 advance fee. The letter did not, however, address the "as is" language. The parties executed the loan commitment on April 14, and Professional remitted the requisite non-refundable $54,000 fee.

Kennedy deputized Volpe, Inc. to conduct the initial appraisal. Volpe determined the property had a value of $2,610,000 and an "as is" market value of 20% less, or $2,088,000. Accordingly, Kennedy offered Professional a loan in the amount of $1,253,000. Professional declined to accept, deciding instead to invoke its right to obtain

3

a second opinion. It sent Professional a copy of a page from the local phone book for "use as a reference for some companies . . . in the local area." In lieu of conversing with Professional about the names on the list, Kennedy unilaterally chose to retain Adamson & Associates, Inc. Professional, manifesting no objection, forwarded Adamson & Associates' $2,000 fee to Kennedy. Adamson & Associates determined the property had a value of $3,040,000 and an "as is" market value of $2,430,000, and Kennedy upped its loan offer to $1,458,000, or approximately 60% of the "as is" value. Despite two extensions of time designed to afford Professional time to contemplate whether it would accept the terms of the offer, Professional ultimately opted to refrain from closing on the transaction.

II.

With the relationship between the parties having irretrievably deteriorated, Professional commenced this action against Kennedy in March 2005, primarily seeking disgorgement of the fees it had forwarded to Kennedy pursuant to the aborted loan commitment. Professional argues Kennedy has a pattern of luring borrowers into paying fees for loans that seldom come to fruition. In this instance, Professional claims Kennedy knew that even if the property appraised at $3,100,000, Kennedy would not offer financing in the $1,800,000 amount Professional needed to make the transaction worthwhile from its perspective.

The District Court initially dismissed the complaint for lack of subject matter jurisdiction, ruling Professional had inadequately pleaded fraud under the New Jersey

Consumer Fraud Act ("CFA") and was therefore bound by the contract's limitation-of-damages clause that capped liability at an amount beneath the $75,000 threshold needed to invoke diversity jurisdiction. *See* 28 U.S.C. § 1332(a). Professional's motion for leave to amend the complaint was denied, but we reversed and held the District Court had abused its discretion in disallowing Professional an opportunity to amend its complaint. *Prof'l Cleaning & Innovative Bldg. Servs. v. Kennedy Funding, Inc.*, 245 F. App'x 161, 167 (3d Cir. 2007).

The final iteration of Professional's complaint included six causes of action: (1) a claim under the CFA against both Kennedy and Gregg Wolfer; (2) a claim for rescission of contract due to unconscionability against Kennedy and Gregg Wolfer; (3) a claim for breach of contract against Kennedy; (4) a claim for common law fraud against Kennedy and Gregg Wolfer; (5) a claim for unjust enrichment against Kennedy and Gregg Wolfer; and (6) a claim under the New Jersey RICO statute ("RICO") against Gregg Wolfer, Jeffrey Wolfer, Joseph Wolfer and Kevin Wolfer (the "Wolfer Defendants").

The District Court granted the individual Wolfer Defendants summary judgment on all counts. It also granted Kennedy summary judgment on all counts aside from those for fraud and unjust enrichment, and it concluded Professional was not entitled to punitive damages on its fraud claim. Without recourse under the CFA or RICO and with punitive damages unattainable, Professional's surviving claims permit recovery solely of compensatory damages. Recognizing the amount sought under these claims hovers below

5

$75,000, the District Court *sua sponte* dismissed the action. Professional timely appealed.[1]

## III.

We review a grant of summary judgment *de novo*, applying the same standard that the District Court should have applied in determining whether summary judgment was appropriate. *Azur v. Chase Bank, USA*, 601 F.3d 212, 216 (3d Cir. 2010). Summary judgment is proper when the record discloses "no genuine issue as to any material fact" and the moving party is therefore "entitled to judgment as a matter of law." Fed R. Civ. P. 56(c)(2). We may affirm a grant of summary judgment "on any grounds supported by the record." *Nicini v. Morra*, 212 F.3d 798, 805 (3d Cir. 2000). When ruling on a motion for summary judgment, a trial court must consider the evidence in a light most favorable to the nonmoving party — accepting its allegations as true, affording it the benefit of all legitimate inferences that may be drawn, and resolving any conflicted assertions in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).

## IV.

When we first encountered this case, it was trapped in a similar state of jurisdictional limbo. The District Court had denied Professional leave to amend its

---

[1] Before dismissing the action, the District Court had exercised jurisdiction under 28 U.S.C. § 1332(a). We have jurisdiction to review a final order of the District Court under 28 U.S.C. § 1291.

complaint to include CFA and common law fraud claims. Without the possibility of the statutorily-enhanced damages available under the CFA or a fraud claim that might have served to vitiate the contract, Professional found itself unable to extricate itself from the fetters of the contractual limitation-of-damages clause. With damages capped at $54,000 under the terms of the contract, the District Court dismissed the matter for want of subject-matter jurisdiction. Now, after the District Court considered these claims on remand, it dismissed the action on jurisdictional grounds. In this version of its complaint, Professional advances three causes of action that would theoretically allow it to surmount this hurdle. As we will explain, Professional's claim under neither the CFA nor RICO has merit, and Professional has failed to demonstrate an entitlement to punitive damages. Accordingly, the District Court acted appropriately in dismissing this action.

A.

1.

The CFA is designed to protect consumers from "sharp practices and dealings in the marketing of merchandise and real estate." *Lemelledo v. Benefit Mgmt. Corp.*, 696 A.2d 546, 550 (N.J. 1997) (internal quotation omitted). Expansive on its face, the statute prohibits "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact . . . in connection with the sale or advertisement of any merchandise or real estate." N.J. Stat. Ann. § 56:8-2 (2010). From the breadth of this statutory language, New Jersey's Supreme Court has discerned a "clear legislative intent that its provisions be

7

applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud." *Lemelledo*, 696 A.2d at 551.

To effectuate this policy aim, New Jersey courts have invoked the CFA to root out sundry sordid business practices. Nevertheless, the CFA does not blanket the entire marketplace. The touchstone for the statute's applicability is whether the consumer has purchased "goods or services generally sold to the public at large." *Cetel v. Kirwan Fin. Group, Inc.*, 460 F.3d 494, 514 (3d Cir. 2006), *cert. denied sub nom. Schneider v. Kirwan Fin. Group, Inc.*, 127 S. Ct. 1267 (2007) (quoting *Marascio v. Campanella*, 689 A.2d 852, 856 (N.J. Super. Ct. App. Div. 1997)). The "entire thrust" of the CFA "is pointed to products and services sold to consumers in the popular sense." *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 561 (D.N.J. 2002) (internal quotation omitted). Thus, the statute's "applicability is limited to *consumer transactions* which are defined both by the status of the parties and the nature of the transaction itself." *Id.* (quoting *Arc Networks, Inc. v. Gold Phone Card Co., Inc.*, 756 A.2d 636, 638 (N.J. Super. Ct. Law Div. 2000) (emphasis added)); *see also Papergraphics Int'l, Inc. v. Correa*, 910 A.2d 625, 628–29 (N.J. Super. Ct. App. Div. 2006) (canvassing cases illuminating how New Jersey courts have confined the CFA to classically consumer-oriented contexts).

The District Court concluded the hard money financing offered to Professional did not qualify as "merchandise" in the popular sense. *See* N.J. Stat. Ann. § 56: 8-1(c) (defining "merchandise" as "any objects, wares, goods, commodities, services, or

anything offered, directly or indirectly to the public for sale"). It conceptually severed the finely-calibrated, "unconventional" financing in which Kennedy traffics and which requires a lender to place uncommon emphasis on an applicant's "special circumstances" from the realm of generic commercial lending, a practice which has been brought within the ambit of the CFA. *See Lemelledo*, 696 A.2d at 551. This distinction is sensible. *See R.J. Longo Constr. Co. v. Transit Am.*, 921 F. Supp. 1295, 1311 (D.N.J. 1996) (gleaning from case law the notion that the "'popular sense' of consumer transactions encompasses mass produced items available to multiple consumers"). As a lender of last resort, Kennedy assists companies with pressing pecuniary needs, and its loan offerings are tailored to accommodate each borrower's unique, often time-sensitive circumstances. As the District Court correctly ruled, the specialized, highly-targeted nature of the services provided by Kennedy and other lenders of its ilk differentiates this type of financing from the sale of credit in the "popular sense." *See Cetel*, 460 F.3d at 514 (finding certain life insurance plans to be "complex tax-avoidance schemes" not covered by the CFA because they were "not available to the general public and were never marketed as such" and because they represented a "highly specific scheme . . . necessarily marketed to a discrete and specific class of capable investors — not the general public").

Professional's standing as a reputable commercial entity reinforces the inapplicability of the CFA to this loan commitment. The District Court did not deny Professional relief under the CFA simply because it has adopted a corporate form. Rather, it wrote Professional "is not an unsophisticated buyer, suffering a disparity of

9

industry knowledge, victimized after being lured into this purchase through fraudulent, deceptive-selling or advertising practices."[2] Professional may have been caught off-guard by the idiosyncratic definition of "as is market price" employed by Kennedy and those appraising the Kansas Property, but familiarity with industry argot is not the sole marker of a party's sophistication. Professional had purchased a real estate company shortly before endeavoring to procure this loan, an undertaking which demands at least a modicum of financial savvy. Prior to consummating the transaction, Professional expressed reservations about several aspects of the draft loan commitment, and it appears as though compromises on at least some of those fronts were reflected in the final loan commitment. For all intents and purposes, Professional was possessed of the requisite financial acumen to protect its interests when pursuing this type of transaction. Although it was less attuned to the intricacies of the hard-money-lending world than was Kennedy, it was not unsophisticated. *See Kugler v. Romain*, 279 A.2d 640, 649 (N.J. 1971) ("the strongest case for relief from . . . deceptive and fraudulent misrepresentations is presented by the poor, the naive and the uneducated consumers who have yielded unwittingly to . . . high pressure sales tactics"); *Boc Group v. Lummus Crest*, 597 A.2d 1109, 1113 (N.J.

---

[2] *Hundred E. Credit Corp. v. Eric Schuster Corp.*, 515 A.2d 246, 249 (N.J. Super. Ct. App. Div. 1986), which Professional cites for the proposition that business entities that are "inexperienced and uninformed in a given consumer transaction" should be afforded special solicitude, merely stands for the basic principle that businesses can be susceptible to victimization at the hands of unscrupulous sellers and are thus generally permitted to maintain causes of action under the CFA.

Super. Ct. Law Div. 1990) ("The Act was created to give new strength to protect the ordinary consumer in the purchase of merchandise in the public market place.").[3]

2.

The CFA entitles private plaintiffs to awards of treble damages and attorney's fees. N.J. Stat. Ann. § 56:8–19. Under New Jersey law, a court must include these amounts when determining whether it has subject matter jurisdiction in a diversity matter. *Suber v. Chrysler Corp.*, 104 F.3d 578, 585–87 (3d Cir. 1997). However, because Professional does not have a colorable claim under the CFA, it will be unable to avail itself of the statute's allowance of such damages award amplifiers to cross the minimum amount-in-controversy threshold. *See id.* at 587 (allowing a plaintiff to use the CFA's

---

[3] Professional wrongly accuses the District Court of ignoring guidance we had previously offered on this issue. This contention stems from a misreading of our opinion occasioned by Professional's earlier appeal, in which it requested we overturn the District Court's order denying it leave to amend its complaint so as to include a CFA claim. *See* 245 Fed. App'x 161 (3d Cir. 2007). In ruling the District Court had abused its discretion, we wrote that "the liberal standard applied to a motion to amend" counseled in favor of allowing Professional to include this cause of action in its complaint. Contrary to Professional's argument, this holding did not implicitly include a determination that the transaction at issue necessarily fell within the scope of the CFA. Rather, we merely discussed the elements of a cause of action under the CFA and concluded Professional's claim had enough potential viability to have put the District Court in error for denying Professional leave to amend under the liberal pleading regime imposed by the Federal Rules of Civil Procedure. We did not delve into whether this loan agreement functioned as a "consumer transaction" as defined under relevant New Jersey law. Meeting this standard is a prerequisite to obtaining relief under the CFA; whether a plaintiff can theoretically satisfy the elements of a tort claim is immaterial if the statute does not capture the conduct in question. Therefore, the District Court acted entirely within the scope of its authority in pursuing this line of inquiry and in ultimately deeming the CFA inapplicable to the facts of this case. We did not address the matter in our prior opinion, and the District Court proceeded adroitly in tackling it on remand.

treble damages provision to influence the amount-in-controversy calculation only when he is not "precluded to a legal certainty from recovering under the NJCFA").

B.

1.

To successfully pursue a claim under New Jersey's RICO statute, a plaintiff must demonstrate that the defendants engaged in a "pattern of racketeering activity." *State v. Ball*, 661 A.2d 251, 261 (N.J. 1995);  N.J. Stat. Ann. § 2C:41-2(a). To constitute a "pattern" for the purposes of the statute, the racketeering activity must consist of "at least two incidents . . . that [have] either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents." N.J. Stat. Ann. § 2C:41-1(d). The statute includes "forgery and fraudulent practices and all crimes defined in chapter 21 of Title 2C of the New Jersey Statutes" in its definition of "racketeering activity." N.J. Stat. Ann. §2C:41-1(a)(o). Professional accused the Wolfers of using Kennedy as a vehicle through which to violate both N.J. Stat. Ann. §§ 2C:21-4(a) and 2C:21-7(h).[4] The former makes it a crime in the fourth degree if a person "falsifies, destroys, removes, conceals any writing or record, or utters any writing or record knowing that it contains a false statement or information, with purpose to deceive or injure anyone or to conceal any wrongdoing."

---

[4] For the purposes of its RICO claim, Professional depicts Kennedy as a conduit for the Wolfers' racketeering activities.

N.J. Stat. Ann. § 2C:21-4(a). The latter prohibits the use of a "false or misleading written statement for the purpose of obtaining property or credit." N.J. Stat. Ann. § 2C:21-7(h).

The crux of the District Court's holding was that Kennedy's definition of "as is" was insufficiently ambiguous as to be "false" under either of these provisions. In both the loan commitment and other assorted documents, Kennedy defined the term as a "three (3) to four (4) month sale to a cash buyer." As the District Court noted, this definition offers ample evidence Kennedy would discount the property's market value by some amount in order to arrive at its loan offer. The term "cash buyer" signifies a condensed crop of prospective purchasers, and the durational language indicates a truncated marketing period. Taken in conjunction, these terms provide an applicant with unmistakable evidence that the value of the collateral property will be reduced before the loan offer is extended.

Professional alleges Kennedy intentionally preserves uncertainty with this nebulous definition in order to lure borrowers into entering loan commitments and parting with the accompanying non-refundable fees despite closing on only a tiny fraction of the loans for which it receives such advance payments.[5] Specifically, Professional

---

[5] In recent years, Kennedy's lending practices have precipitated a multitude of lawsuits. *See, e.g. Construcciones Haus Soceidad v. Kennedy Funding Inc.*, No. 07-cv-0392, 2008 U.S. Dist. LEXIS 33685 (D.N.J. Apr. 24, 2008); *Royale Luau Resort, LLC v. Kennedy Funding, Inc.*, No. 07-1342, 2008 U.S. Dist. LEXIS 11902 (D.N.J. Feb. 19, 2008); *Omni Credit Alliance, Inc. v. Kennedy Funding, Inc.*, No. 04-4764, 2007 U.S. Dist. LEXIS 92569 (D.N.J. Dec. 11, 2007); *Kennedy Funding, Inc. v. Ruggers Acquisition and Dev.*, No. 07-669, 2007 U.S. Dist. LEXIS 55261 (D.N.J. July 31, 2007); *JM Realty & Invs. v. Kennedy Funding, Inc.*, No. 07-218, 2007 U.S. Dist. LEXIS 54103 (D.N.J. July 26,

continues to ascribe sinister motives to Kennedy, arguing in its brief that Kennedy knows "borrowers will not obtain the financing they require because they, and only they, know that they utilize an alternative valuation formula to appraise the collateral properties." Significantly, however, each of the appraisers retained by Kennedy and Professional to provide a valuation of the Kansas Property independently discounted its market value by approximately the same amount. If anything, this demonstrates Kennedy was not privy to information withheld from Professional; it did not provide a more precise definition of "as is" because it was reliant on the appraisals of third parties. Perhaps Kennedy understood the property value would be marked down, but that much was clear from the definition provided in the loan agreement. If Professional considered the term unsettlingly vague, it was incumbent on Professional itself to obtain clarification.[6]

---

2007); *Kennedy Funding, Inc. v. Lion's Gate Dev.*, No. 05-4741, 2006 U.S. Dist. LEXIS 68982 (D.N.J. Sept. 25, 2006). Professional argues this track record lends credence to its position that Kennedy knew manipulating the "as is" term to undervalue the property would resultantly reduce its loan offer to a number Professional would likely not accept. Professional points to Kennedy's recent admission that approximately 80% of its loan commitments between 2001 and 2006 failed to proceed to closing as further evidence that Kennedy has finely honed its "bait-and-switch" scheme. The District Court concluded that "evidence of other subsequent transactions involving Kennedy where the appraised market value was discounted to derive an 'as is' market value" was not germane to its fraud analysis because these facts were not susceptible of "exact knowledge" at the time the alleged misrepresentation was made. *See Joseph J. Murphy Realty, Inc. v. Shervan*, 388 A.2d 990, 993 (N.J. Super. Ct. App. Div. 1978) (propounding this standard). And while this pattern would ostensibly impact the RICO claim, the District Court's thoroughgoing analysis holds up in the face of Professional's contention that Kennedy routinely makes dubious intimations that allow it to pocket fees without extending loans.

[6] Professional maintains that it inquired into the meaning of the "as is" term during negotiations. The record belies this contention. In her April 12, 2004 letter to Wolfer,

And, because the parties agreed to rely on independent appraisers to determine the "as is" market value, the omission of a more exact definition cannot be construed as misleading — the terms of the loan agreement outlined certain parameters, and the appraisers proceeded in accordance with its terms. According to Professional, Kennedy's RICO liability derives from misleading borrowers whom it knows need a specific amount of loan money into parting with hefty non-refundable fees while knowing that the "as is" calculation will leave the borrowers short of that amount. Desires of the borrowers aside, Kennedy contracted to provide a loan in the amount of sixty percent of the "as is" market value.[7] The term appears to have been defined to alert Professional to a likely markdown

_____

Wood pushed back on several terms contained within the proposed agreement but betrayed no apprehension regarding the "as is" valuation. On a conference call with Wood, Wolfer reaffirmed Kennedy's commitment to lend the desired $1,800,000 so long as the property's "appraised value" exceeded $3,100,000. Wood did not probe deeper or question how the "as is" language would affect this calculation. Viewed in the light most favorable to Professional, we can only concede Wolfer did not go to great lengths to ensure Wood was fully cognizant of the significance with which the term was imbued. The lack of unsolicited edification does not mark the contractual language as false or misleading. Furthermore, after the Volpe appraisal registered at $2,610,000 with an "as is" value of $2,088,000, Professional neither protested nor raised additional questions. Instead, it exercised its contractual prerogative to obtain a second appraisal. Adamson & Associates then utilized a similar reduction formula, reinforcing Kennedy's stance that the term as defined was not false or misleading and that Professional was remiss in not pressing for a clarification if it considered the term inexcusably vague.

[7] The existence of lawsuits assailing Kennedy for its allegedly unseemly business practices should not be confused with evidence of culpability. Whether a contract term is clear or ambiguous is a question of law. *Nester v. O'Donnell*, 693 A.2d 1214, 1220 (N.J. Super. Ct. App. Div. 1997). Although multiple misunderstandings regarding a specific term would presumably serve as evidence as to the haziness of its meaning, Professional points only to the fact that suits have been filed and not to any advantageous language emanating from court rulings on these cases. As a matter of law, therefore, we concur

of the $3.1 million appraisal it anticipated. With Volpe and Adamson & Associates having each exercised its independent discretion in discounting the appraisal in a similar manner, Professional cannot sustain its position that Kennedy insidiously exploited a term whose meaning only it knew.

2.

New Jersey's RICO statute contemplates recovery of treble damages. N.J. Stat. Ann. § 2C:41-4(a)(8). However, Professional's inability to implicate the Wolfers under that statute estops it from invoking the potential for RICO recovery as a basis for subject matter jurisdiction. *See Franklin Med. Assocs. v. Newark Pub. Sch.*, 828 A.2d 966, 978 (N.J. Super. Ct. App. Div. 2003) (conditioning recovery of treble damages upon demonstration of an actual RICO violation).[8]

C.

1.

To successfully maintain a common law fraud claim in New Jersey, a plaintiff must demonstrate (1) a material misrepresentation of a presently existing or past fact; (2)

---

with the District Court's assessment that the plain meaning of the definition provided in the loan commitment does not expose Kennedy to RICO liability.

[8] Professional added its RICO claim in its Second Amended Complaint. Thus, when the District Court originally dismissed this matter for lack of subject matter jurisdiction, it did so exclusively on the basis of Professional's perceived inability to successfully plead fraud. The court at that time had no cause to consider whether the treble damages conceivably recoverable under a RICO claim would nudge Professional past the $75,000 threshold.

knowledge or belief by the defendant of its falsity; (3) an intention that the plaintiff rely on the misrepresentation; (4) reasonable reliance thereon; and (5) resulting damages. *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997). Here, because triable issues of material fact remain outstanding, the District Court properly denied both parties' motions for summary judgment as to Professional's common law fraud claim against Kennedy. Should the finder of fact determine that Gregg Wolfer both asserted that there would be "no problem" completing the transaction if the Kansas Property met the targeted "appraised value" of between $3,100,000 and $3,200,000 and that the term "appraised value" is reasonably susceptible of multiple interpretations, Professional's claim would have legs.[9] Although Kennedy attempts to portray these comments as ruminations on the likelihood of a future occurrence, Wolfer's intent to actualize the

---

[9] The District Court correctly concluded that Wolfer's failure to disclose allegedly material information could not form the basis of Professional's fraud complaint. Whether a duty to disclose exists is a question of law. *Carter Lincoln-Mercury, Inc. v. Emar Group*, 638 A.2d 1288, 1294 (N.J. 1994). As a matter of law, the relationship between Kennedy and Professional was not one in which such a duty ordinarily arises. *See Berman v. Gurwicz*, 458 A.2d 1311, 1313–14 (N.J. Ch. 1981) (explaining the duty typically derives from (1) a fiduciary relationship between the parties; (2) the express reposing of trust and confidence in the party alleged to hold the duty; or (3) a transaction that is "intrinsically fiduciary" in nature). Moreover, Wolfer was not obligated to expound upon the definition of "as is market value" embodied in the Loan Agreement in order to counterbalance whatever misconceptions Professional may have had regarding that term. Wolfer's appreciation of Professional's financing needs is immaterial and does not automatically give rise to the inference that Professional expressly reposed trust in Kennedy. The definition provided in the loan commitment was reasonably comprehensive and did not necessitate further qualification in order to ensure Professional grasped the entire picture. *Cf. Tobin v. Paparone Const. Co.* 349 A.2d 574, 577 (N.J. Super. Ct. Law. Div. 1975) (imposing a duty on a contracting party to

agreement in the amount desired by Professional at the time of this communication is a presently-existing fact that can form the basis of a fraud claim.

2.

With its CFA and RICO claims off the table, Professional is forced to rely on the prospect of a successful common law fraud claim and an attendant award of punitive damages to scale the $75,000 barrier. As noted, a finding of fraud in the inducement would be grounds to void the contract and abrogate the limitation-of-damages clause. Under New Jersey law, a plaintiff may recover punitive damages on a common law fraud claim even without obtaining a concomitant award of compensatory damages. *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 477 A.2d 1224, 1233 (N.J. 1984). When punitive damages are available, they are to be aggregated with actual damages when determining whether a plaintiff has satisfied the amount-in-controversy requirement. *Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1046 (3d Cir. 1993).

In New Jersey, a plaintiff may obtain punitive damages only if he proves, by clear and convincing evidence, (1) he suffered harm on account of the defendant's acts or omissions, and (2) defendants acted with either (a) actual malice; or (b) a wanton and willful disregard of foreseeable harm. N.J. Stat. Ann. § 2A:15-5.12(a). The statute defines "actual malice" as "an intentional wrongdoing in the sense of an evil-minded act" and "wanton and willful disregard" as "a deliberate act or omission with knowledge of a high

---

"materially qualify" certain statements when its counterparty was left with a false impression and lacked the means to independently discover the truth of the matter).

degree of probability of harm to another and reckless indifference to the consequences of such act or omission." N.J. Stat. Ann. § 2A:15-5.10.

As the District Court correctly concluded, Professional is not entitled to punitive damages because it cannot meet its burden of demonstrating by clear and convincing evidence that Kennedy acted with the requisite culpability. Professional's claim for punitive damages largely suffers from the same deficiencies as its RICO claim. That is, Professional struggles to demonstrate Kennedy representatives made deliberately false or misleading representations in order to secure a commitment and up-front fees from Professional while knowing the appraisers' discounted valuations would engender a scenario in which the loan monies would likely go untendered.

Therefore, even if Professional were to prevail on its common law fraud claim and obviate the damage-limitation clause, its recovery would be limited to the $54,000 in compensatory damages it seeks under Counts Four and Five of its complaint. Consequently, Professional is unable to meet the amount-in-controversy threshold, and the District Court acted appropriately in dismissing this action on jurisdictional grounds.[10]

---

[10] For the reasons set forth by the District Court, we will also affirm the grants of summary judgment to Kennedy on Professional's claims for breach of contract and rescission due to unconscionability as well as its grant of summary judgment to Gregg Wolfer on each count of Professional's complaint. Moreover, although Professional's claim for unjust enrichment against Kennedy survived the summary judgment phase of the proceeding, its continued viability — even when coupled with the enduring common law fraud claim — is insufficient to confer diversity jurisdiction upon the court.

## V.

For the foregoing reasons, we will affirm the judgment of the District Court.