In re DIET DRUGS (PHENTER-MINE/FENFLURAMINE/DEXFEN-FLURAMINE) PRODUCTS LIABILITY LITIGATION.

**Sheila Brown, et al.,**

v.

**American Home Products Corporation.**

MDL No. 1203.
Civ.A. No. 99–20593.

United States District Court,
E.D. Pennsylvania.

March 8, 2006.

Andrew A. Chirls, Wolf, Block, Schorr and Solis–Cohen LLP, Arnold Levin, Levin Fishbein Sedran & Berman, Edward W. Madeira, Jr., Pepper, Hamilton & Scheetz, Michael T. Scott, Reed Smith, Nina M. Gussack, Pepper Hamilton LLP, Robert N. Spinelli, Kelley Jasons McGuire & Spinelli, LLP, Philadelphia, PA, Gerald Cooper Kell, U.S. Department of Justice, Washington, DC, John Fitzpatrick, Leclair & Ryan, Richmond, VA, for Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation.

Gregory P. Miller, Miller Alfano & Raspanti, P.C., Philadelphia, PA, pro se.

### MEMORANDUM AND PRETRIAL ORDER NO.

BARTLE, Chief Judge.

Certain class members in this Nationwide Class Action Settlement involving Wyeth's [1] diet drugs Pondimin and Redux have now moved for relief from judgment under Rule 60(b) of the Federal Rules of Civil Procedure.

This court, after a fairness hearing, certified the class and approved the Nationwide Class Action Settlement Agreement ("Settlement Agreement") in Memorandum and Pretrial Order ("PTO") No. 1415 on August 28, 2000. Movants, who did not file their 60(b) motion until over four years thereafter, seek to overturn PTO No. 1415.

They want a new class notice with the full opportunity for all class members to opt-out of the Nationwide Class Action Settlement. Wyeth as well as Class Counsel oppose the motion.

### I.

Approximately six million people ingested Pondimin and/or Redux, commonly known as fen-phen, before these diet drugs were removed from the market on September 15, 1997 due to growing evidence that they could cause valvular heart disease ("VHD") or even primary pulmonary hypertension ("PPH"), a fatal disease.[2] The far more common VHD is marked by a condition known as valvular regurgitation where blood that is supposed to flow forward through the heart leaks backward through the diseased heart valve. Both VHD and PPH are addressed in detail in several of our prior rulings, including PTO Nos. 1415 and 4567.

A wave of litigation followed shortly after the removal of Pondimin and Redux from the market. On October 12, 1999, a settlement class action complaint, based on diversity jurisdiction, was filed in this court, which had previously been designated to preside over the Multi–District Litigation ("MDL") for Pondimin and Redux cases. The class action complaint, which was ultimately amended three times, was filed as "a vehicle for combining the claims of class members asserted [against Wyeth] in pending federal and state diet drug litigation throughout the country" in order to facilitate class action treatment for settlement purposes. PTO No. 1415 at 43.

---

1. Wyeth was known as American Home Products Corporation ("AHP") when the Settlement Agreement was initially approved by the court in August, 2000.

2. PPH, which causes damage to pulmonary circulation, is "a relentlessly progressive disease that leads to death in virtually all circumstances." PTO No. 1415 at 38. Fortunately PPH is uncommon. The Settlement Agreement does not limit the rights of class members who developed PPH to seek complete recovery against Wyeth through all available tort remedies. *See* Settlement Agreement § I.53.

Ultimately, on November 18, 1999, class representatives and Wyeth executed the Settlement Agreement in issue, to which our predecessor Judge Louis C. Bechtle gave preliminary approval on November 23, 1999. Notice was then disseminated to the class. After holding a fairness hearing over eight days and taking testimony from more than twenty witnesses in early May, 2000, the court issued PTO No. 1415 approving the Settlement Agreement. PTO No. 1415, among other things, made specific findings of fact regarding the establishment of the AHP Settlement Trust funded by Wyeth (the "Settlement Trust"), the notice plan, the adequacy of legal representation, and the certification of the proposed class under Rule 23 of the Federal Rules of Civil Procedure. While several objections to the proposed class and Settlement Agreement were raised before the court, all appeals of PTO No. 1415 were ultimately withdrawn.

In brief summary, the Settlement Agreement divided the universe of diet drug users into five separate subclasses based on both duration of diet drug use and diagnosis of FDA Positive levels[3] of valvular regurgitation as of September 30, 1999. The creation of these subclasses reflected several important realities: (1) certain lower levels of regurgitation are asymptomatic in that the presence of the condition is not necessarily noticeable to a lay person; (2) only a segment of diet drug users are likely to have developed VHD as a result of their drug use; (3) the duration-response relationship between consuming diet drugs and developing VHD establishes that at least three months of diet drug use are necessary to cause any adverse health effects; and (4) the gener-

ally accepted scientific opinion holds that VHD is progressive in nature in that once significant valvular regurgitation exists, it tends to cause more severe regurgitation in a considerable subset of patients. In addition, as the court explained in PTO No. 1415, the existence of VHD and the extent of regurgitation associated with it can be diagnosed shortly after discontinuing diet drug use. This diagnosis can be made by a cardiologist after viewing an echocardiogram, a non-invasive procedure in which ultrasound waves are used to image cardiac structure and blood flow in the heart. *See* PTO No. 1415 at 23. The court found that the available science demonstrated no risk that a diet drug patient who received a clean bill of health from an echocardiogram shortly after discontinuing the drugs would develop diet drug-induced VHD at some future point in time.

The class was defined to include all persons in the United States who ingested Pondimin and/or Redux, or their legal representatives, heirs or beneficiaries, and certain persons asserting derivative claims. The five subclasses, numbered 1(a), 1(b), 2(a), 2(b) and 3, generally speaking, differentiated diet drug users who had ingested fen-phen for 61 or more days from those who had not, and class members who had not yet been diagnosed with VHD from those who had. *See* Settlement Agreement § II.C. The class was represented by Arnold Levin, John J. Cummings, III, Stanley Chesley, Michael D. Fishbein, Gene Locks, Sol Weiss and Charles Parker (collectively, "Class Counsel"). *See* PTO No. 1415 at 100. Each of the five subclasses also had separate representation. *See id.* at 101. Regardless of the length of diet drug use, all members of the class

---

3. This term refers to those levels of valvular regurgitation that the United States Food and Drug Administration ("FDA") has determined are medically relevant in that they are beyond the relatively common low levels found in the general population. All of the experts who testified on this issue in 2000 agreed "FDA Positive" is the proper way to identify meaningful regurgitation. *See* PTO No. 1415 at 25.

were provided with an "initial opt-out right" on or before March 30, 2000. By submitting a notice of their intention to opt out, those class members who timely and properly exercised this right could pursue any legal claim against Wyeth in the tort system without any limitation imposed by the Settlement Agreement. *See* Settlement Agreement § IV.D.2. Approximately 50,000 class members exercised initial opt-out rights.

The Settlement Agreement made several distinctions among class members who did not initially opt out. Specifically, the Settlement Agreement recognized that a potentially large number of diet drug users had some level of valvular regurgitation but were asymptomatic and did not know they were affected. Accordingly, the Settlement Agreement recognized that these class members would require echocardiograms in order to determine the extent of any diet-drug related damage. Thus, class members who ingested diet drugs for 61 or more days were entitled to certain medical monitoring and screening compensation benefits paid through the establishment of the Settlement Trust regardless of their ultimate VHD diagnosis. Class members who ingested diet drugs for 60 or fewer days were entitled to monitoring relief and reimbursement of screening expenses in only limited circumstances. The Settlement Agreement permitted class members to have their screening echocardiograms read and submitted by any Board-certified or Board-eligible cardiologist of their own choosing ("Qualified Physician"). *See* Settlement Agreement §§ I.47, IV.B.1.

After the initial screening echocardiogram, class members who were diagnosed by their Qualified Physician with FDA Positive levels of regurgitation had the right to opt out of the settlement and pursue a claim for compensatory damages in the tort system. Class members who exercised this "intermediate" opt-out right, however, were prohibited from seeking punitive, multiple or exemplary damages, consumer fraud damages or medical monitoring against Wyeth. In exchange for this waiver of certain tort remedies, Wyeth was forbidden from asserting any defenses based on the statute of limitations or any other time bar.

Those individuals who had FDA Positive levels of regurgitation but did not exercise either an initial or intermediate opt-out right had the right to receive continued medical monitoring services from the Settlement Trust. On top of those monitoring benefits, FDA Positive class members who did not opt out and who suffered additional and more severe symptoms or heart damage related to VHD[4] were eligible for monetary compensation from the Settlement Trust known as "matrix benefits." Under limited circumstances, class members eligible for matrix benefits were entitled to forgo their matrix compensation and exercise a "back-end" opt-out to pursue claims for compensatory damages in the tort system.[5] Back-end opt-outs are subject to the same punitive damage prohibition as intermediate opt-outs but also receive the same protection against Wyeth's time-related defenses.

The matrix benefits schedule established four payment matrices to compensate the severely harmed class members. Matrix A–1 describes the compensation to diet drug recipients with serious VHD who took diet drugs for 61 days or longer that

---

4. As a brief summary, these additional complicating factors included more severe levels of regurgitation, valve-replacement surgery, severe injuries to other organs, stroke or even death in certain cases.

5. Back-end opt-out rights are limited to a 120 day window after the class member first knows (or should have known) of his or her eligibility for matrix benefits. These rights expire after December 31, 2015.

meet certain specific conditions. Matrix B–1 sets forth the compensation available to all other class members with serious VHD, regardless of the duration of diet drug use, including those whose VHD is likely attributable to reasons other than simply diet drug consumption. The "derivative matrices," Matrix A–2 and Matrix B–2, state the compensation for spouses, parents, children and significant others of diet drug recipients entitled to compensation on either Matrix A–1 or Matrix B–1, respectively. Benefits payable under all four of these matrices depend on the age of the diet drug recipient at the time of the VHD diagnosis as well as the applicable level of VHD severity on a five tier scale.

The benefits outlined in the four matrices, as noted above, are paid by the Settlement Trust which was established and funded by Wyeth in accordance with the terms of the Settlement Agreement. The Settlement Trust included two separate funds: "Fund A" to provide funding for all non-matrix benefits and "Fund B" to fund matrix benefits. Wyeth agreed to pay $1 billion into Fund A, which includes money to pay the aforementioned medical monitoring benefits, as well as $2.55 billion into Fund B. In addition, Wyeth received certain limited credits against these sums for payments made to initial and back-end opt-out plaintiffs. As noted above, the Settlement Agreement allowed class members to have their echocardiograms read and submitted to the Settlement Trust by their own Qualified Physician. To help protect the integrity of the Settlement Trust's disbursement of these enormous sums of money, the Settlement Agreement permitted quarterly audits of up to 15% of claims submitted to the Trust in order to prevent fraud, with the right of the court to require additional audits for "good cause shown." Settlement Agreement § VI.E.8.

In the years that followed PTO No. 1415, a myriad of problems developed in the administration of certain terms and conditions of the Settlement Agreement. *See generally* PTO No. 4567 at 15–23 (Mar. 15, 2005). For instance, after a hearing, we found that 78 echocardiograms submitted by two cardiologists on behalf of claimants were "medically unreasonable" and the product of mass production echocardiogram operations. *See* PTO No. 2640 at 23 (Nov. 14, 2002). The two law firms representing those claimants are among those seeking relief from judgment for their clients here. It soon became apparent that the Settlement Trust was being inundated with an unexpectedly high influx of claims, many of which are now known to have been without merit, if not fraudulent.

By late 2002, it was evident the Trust faced the prospect of running out of money before all legitimate class members could be paid. As a result of this disparity between the number of matrix claims anticipated and the number of claims actually submitted to the Trust, the court ordered a 100% audit of all matrix claims to ensure that only proper claims would be paid. *See* PTO No. 2662 at 13 (Nov. 26, 2002).[6] Thereafter, as a result of the dwindling resources of the Trust, Wyeth and Class Counsel jointly proposed the Seventh Amendment to the Settlement Agreement (the "Seventh Amendment") on July 21, 2004. The central provision of the Seventh Amendment was the establishment by Wyeth of a supplemental fund of $1.275 billion to pay diet drug claims. In contrast

---

**6.** In PTO No. 2662, we did not make specific findings of fraud. Instead, we noted that "the claims simply do not mesh with the legitimate expectations of the court and the parties." PTO No. 2662 at 12. Faced with the dueling possibilities that either the epidemiologists were wrong or that "something may be seriously amiss," we found the "only way we can ever find out which answer is correct is through 100% audits." *Id.*

to the operation of the matrix plan under the Settlement Agreement, the Seventh Amendment divided the supplemental fund ratably among all qualified class members based on an independent medical review of their claims. In exchange for Wyeth's assumption of this substantial financial obligation, Seventh Amendment participants were required to abandon any remaining opt-out rights and to release the right to challenge the Settlement Agreement in any respect. Class members were offered the right to opt-out of the Seventh Amendment and to continue to seek benefits from the Settlement Trust under the regime set forth in the Settlement Agreement. Notice was given to class members during Fall, 2004. *See* PTO No. 4567 at 48–53. After holding a two-day hearing in January, 2005, the court gave final approval to the Seventh Amendment on March 15, 2005. *See id.* at ¶ 1. Only one class member pursued an appeal of our approval of the Seventh Amendment, which was rejected without opinion by the Court of Appeals in an order dated November 1, 2005. *See In re Diet Drugs,* No. 05–2213 (3d Cir. Nov. 1, 2005), *reh'g denied* (Dec. 15, 2005).

Participation in the Seventh Amendment settlement process has been substantial. As we noted in PTO No. 4567 approving the Seventh Amendment, only 6,959 members of the class elected to "opt-out" of the Seventh Amendment.[7] *See* PTO No. 4567 at 51. This is particularly significant in light of the court's finding that over 95 percent of the some 620,000 class members who were sent copies of the Seventh Amendment notice actually received at least one copy of that notice. *Id.* at 48–51. In fact, the Settlement Trust has informed the court that only 2,540 class members remain who seek the aforementioned ma-

trix benefits under the Settlement Agreement as of December 31, 2005. These remaining matrix claimants include a wide range of potential payouts, ranging from $7,389 (lowest level Matrix B–1) to $1,485,000 (highest level Matrix A–1). The average matrix benefit paid through December 31, 2005 was $371,775. The Trust had $1,435,004,825 in available funds as of January 1, 2006. No one asserts that the resources of the Trust are now insufficient to pay all remaining legitimate matrix claimants the full amount due under the matrix schedule distributed with the original class notice approved in PTO No. 1415.

On November 9, 2004, before the court had approved the Seventh Amendment, movants filed the current motion pursuant to Rule 60(b). Briefing was stayed pending the fairness hearing on the Seventh Amendment and to permit subsequent settlement negotiations between the parties. *See* PTO No. 4749 (Mar. 22, 2005); PTO No. 5399 (Jul. 1, 2005). These negotiations did not resolve the matter. The court thereafter lifted the stay and heard oral argument on the pending 60(b) motion.

We note that the pending motion lists 8,366 named movants. This apparently includes all the class member clients, regardless of their opt-out status, represented by the separate law firms of Napoli, Kaiser & Bern, LLP and Hariton & D'Angelo, LLP (collectively "Napoli/Hariton"). In addition, clients of several other law firms have joined in the motion, in full or in part, or have filed supplemental legal memoranda with the court: Aylstock, Witkin & Sasser PLC on behalf of its approximate 2,993 clients; Miller & Associates on behalf of its 5,190 clients; Carey & Danis, L.L.C. on behalf of approximately 36 clients; Avelino & Associates, P.C. on be-

---

7. Of these 6,959 opt-outs, only 1,906 are definitively Matrix level claims. The remainder are claimants who potentially could qualify for back-end opt-outs or Matrix payment rights in the future.

half of 41 clients; Maria C. Marinello, Esquire on behalf of 66 clients; William P. Ronan, Esquire on behalf of 140 clients, and Susan Bartell Palay, Esquire on behalf of one. According to the court's calculation, some 16,833 class members have joined the motion. Consequently, movants necessarily include thousands of individuals who are not currently seeking matrix benefits from the Settlement Trust.

## II.

■ Rule 60(b) provides in pertinent part:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken.

Fed R. Civ. P. 60(b). Our Court of Appeals has cautioned that "the remedy provided by Rule 60(b) is 'extraordinary, and special circumstances must justify grant-

ing relief under it.'" *Moolenaar v. Gov't of Virgin Islands*, 822 F.2d 1342, 1346 (3d Cir.1987) (citation omitted). Movants bring their motion only under subsection (4), arguing that the judgment set forth in PTO No. 1415 is "void." This selection is no trivial matter because the legal analysis, timing, and even type of appellate review differ based on the particular subsection of Rule 60(b) invoked. *See, e.g., Compass Tech., Inc. v. Tseng Labs., Inc.,* 71 F.3d 1125, 1130 (3d Cir.1995) (Rule 60(b)(2)); *Moolenaar,* 822 F.2d at 1346 (Rule 60(b)(6)); *Boughner v. Sec'y of Health,* 572 F.2d 976, 978 (3d Cir.1978) (Rule 60(b)(1)).

■ A motion brought under subsections (1), (2) or (3) of Rule 60(b) is subject to an explicit one-year filing requirement. Even if the court limits its review of the motion as brought pursuant only to Rule 60(b)(4), Wyeth nevertheless contends the motion is time-barred because it was not brought "within a reasonable time." The instant motion was not filed until November 9, 2004, more than four years after the court's approval of the class action settlement in PTO No. 1415 on August 28, 2000. In a recent non-precedential opinion, however, our Court of Appeals found that a delay of ten years in bringing a 60(b)(4) motion did not bar consideration of the request on the merits. *See Christian v. Newfound Bay,* 103 Fed.Appx. 447, 449 (3d Cir.2004).[8] This reflects the basic premise that "no passage of time can render a void judgment valid, and a court may always take cognizance of a judgment's void status whenever a Rule 60(b) motion is brought." *United States v. One Toshiba Color Television,* 213 F.3d 147, 157 (3d Cir.2000). Several other courts of appeals have reached the conclusion that a 60(b)(4)

---

**8.** A non-precedential opinion is not binding precedent, but rather constitutes merely persuasive authority. *See* Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3.

motion can never be untimely. *See, e.g., Cent. Vt. Pub. Serv. Corp. v. Herbert,* 341 F.3d 186, 189 (2d Cir.2003); *Sea–Land Serv., Inc. v. Ceramica Europa II, Inc.,* 160 F.3d 849, 852 (1st Cir.1998); *Meadows v. Dominican Republic,* 817 F.2d 517, 521 (9th Cir.1987). We conclude that the pending motion is not time-barred insofar as it is properly based on subsection (4) of Rule 60(b).[9]

■ Under Rule 60(b)(4), movants must demonstrate the underlying judgment in PTO No. 1415 handed down on August 28, 2000 is void. When a judgment is void, it is "one which, from its inception, was a complete nullity and without legal effect." *Raymark Indus., Inc. v. Lai,* 973 F.2d 1125, 1132 (3d Cir.1992). Our Court of Appeals has ruled, however, that "a judgment is not void and is therefore not within the ambit of 60(b)(4) simply because it is erroneous, or is based upon precedent which is later deemed incorrect or unconstitutional." *Marshall v. Bd. of Educ.,* 575 F.2d 417, 422 (3d Cir.1978). In like vein, Professor Moore instructs, "a judgment is not void simply because it is wrongly decided." Moore's Federal Practice § 60.44[1][a].

In *Marshall,* the Court of Appeals explained that a judgment may be "subject to relief under 60(b)(4), if the court that rendered it lacked jurisdiction of the subject matter or the parties or entered 'a decree which is not within the powers granted to it by the law.'" 575 F.2d at 422 (citation omitted). There, the court held that the district court's judgment was not void even though the Supreme Court in a later unrelated case held unconstitutional the underlying statute on which the

judgment was based. In a recent unpublished opinion, our Court of Appeals further defined the grounds for a 60(b)(4) motion. It held that a "judgment can be voided on two grounds: (1) if the rendering court lacked subject matter jurisdiction or (2) if it acted in a manner inconsistent with due process of law." *Constr. Drilling, Inc. v. Chusid,* 131 Fed.Appx. 366, 372 (3d Cir.2005). Other circuits have applied this same two-prong analysis. *See, e.g., Wendt v. Leonard,* 431 F.3d 410, 412 (4th Cir.2005); *New York Life Ins. Co. v. Brown,* 84 F.3d 137, 143 (5th Cir.1996); *Margoles v. Johns,* 660 F.2d 291, 295 (7th Cir.1981).

### III.

■ Movants first contend that the court lacked subject matter jurisdiction over the diversity action because thousands of class members with only medical monitoring claims did not meet the statutorily required amount in controversy under 28 U.S.C. § 1332.[10] Movants argue that these class members will receive, at most, actual benefits of about $11,364 each under the Settlement Agreement, a sum far less than an amount in excess of $75,000 as required under § 1332.

■ The burden on movants here is a heavy one because of the strong interest in the finality of judgments. As the Seventh Circuit has stated, "a lack of subject matter jurisdiction will not always render a final judgment 'void' [under Rule 60(b)(4) ]. Only when the jurisdictional error is 'egregious' will courts treat the judgment as void." *United States v. Tittjung,* 235 F.3d 330, 335 (7th Cir.2000) (citation omitted).

---

9. While there may be no time limit in bringing a motion under Rule 60(b)(4), delay may be a factor in determining what further relief may be available if a judgment is declared to be void. *See One Toshiba,* 213 F.3d at 158.

10. This statute provides that "district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States." 28 U.S.C. § 1332(a).

In *Marshall*, though not directly addressing the issue, our Court of Appeals cited approvingly in dicta the First Circuit's similar "clear usurpation of power" standard. 575 F.2d at 422 n. 19 (citing *Lubben v. Selective Serv. Sys. Local Bd. No. 27*, 453 F.2d 645, 649 (1st Cir.1972)). Other circuits are in agreement that a 60(b)(4) movant must show either a "clear usurpation of power," *In re Bulldog Trucking, Inc.*, 147 F.3d 347, 352 (4th Cir.1998), or the likewise stringent "total want of jurisdiction," *Nemaizer v. Baker*, 793 F.2d 58, 65 (2d Cir.1986), or "no arguable basis for jurisdiction," *In re G.A.D., Inc.*, 340 F.3d 331, 336 (6th Cir.2003).

■ Relief under Rule 60(b)(4) for lack of subject matter jurisdiction is unavailable if that issue was litigated before the judgment became final. In *Marshall*, the Court of Appeals made clear that district courts have the authority " 'to determine whether or not they have jurisdiction to entertain the cause and for this purpose to construe and apply the statute under which they are asked to act. Their determinations of such questions, while open to direct review, may not be assailed collaterally.' " *Marshall*, 575 F.2d at 423 (quoting *Chicot Cty. Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 376, 60 S.Ct. 317, 84 L.Ed. 329 (1940)). This assessment reinforces the "underlying policy of res judicata—that a person who has had his day in court is not entitled to another." *E.E.O.C. v. U.S. Steel Corp.*, 921 F.2d 489, 495 (3d Cir.1990). Professor Moore supports this reasoning: "It has long been established that if the subject-matter jurisdiction of the court is actually litigated by the parties, the matter is conclusively settled, the judgment is not void, and there will be no relief from the judgment (at least not after all appeals have been waived or exhausted) simply because the court's decision is erroneous." Moore's Federal Practice § 60.44[2][b]. Simply put, because a " 'court has the power to determine its own jurisdiction,' " an error in the exercise of that power when the issue has been litigated is not a "clear usurpation" of the court's authority subject to a 60(b)(4) collateral attack. *See Marshall*, 575 F.2d at 422 n. 19 (citation omitted).

We turn to the question whether subject matter jurisdiction was actually litigated before Judge Bechtle at the fairness hearing in 2000. The third amended class action complaint, relied on by the court in PTO No. 1415, plainly alleges that "plaintiffs have claims for damages exceeding $75,000.00, exclusive of interests and costs." The "sum claimed by the plaintiff controls," provided that the claim is made in good faith. *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288, 58 S.Ct. 586, 82 L.Ed. 845 (1938); *see also Suber v. Chrysler Corp.*, 104 F.3d 578, 583 (3d Cir.1997). The third amended complaint sought both compensatory and punitive damages on behalf of the class. In addition, the class sought both injunctive and equitable relief in the form of a comprehensive medical monitoring program and the creation of a $25 million medical research fund. The transcript from the May, 2000 fairness hearing reveals that the court grappled with the administration and value of these proposed alternative forms of relief to class members. It was acknowledged that the direct monetary value of benefits actually paid through the Settlement Agreement would not exceed $75,000 for monitoring-only claimants individually. Nonetheless, the benefit to each such class member was augmented by the value of the $25 million medical research fund which was being established. While movants may be unhappy with this determination, there is no question that the parties actually litigated the question of whether the amount in controversy was sufficient to confer diversity jurisdiction pursuant to 28 U.S.C. § 1332.

The court included in PTO No. 1415 an explicit finding of subject matter jurisdiction over the class action. Judge Bechtle wrote:

The $75,000.00 amount in controversy requirement is also met. Plaintiffs seek a comprehensive medical monitoring program. In addition, the settlement provides for a $25 million medical research fund to examine the relationship between diet drugs and VHD.

In *Jeffers v. American Home Products Corporation*, the court found that a similar request in a class complaint for medical monitoring which included a research fund was sufficient to meet the jurisdictional amount. *See* 1999 WL 673066 (E.D.Pa. Aug. 26, 1999); Pretrial Order No. 865 at 9–13 (finding that request for medical monitoring which included research fund met jurisdictional amount); *see also Katz v. Warner–Lambert Co.*, 9 F.Supp.2d 363, 364 (S.D.N.Y. 1998) (holding that request for medical research fund satisfied jurisdictional amount). Here, the court adopts the reasoning in *Jeffers* and the authorities cited therein in support of its having subject matter jurisdiction. *See* Pretrial Order No. 865 at 9–13.

PTO No. 1415 at 76–77.

It is not necessary that the particular movants currently before the court were the ones who actually litigated the subject matter jurisdiction question back in 2000. As our Court of Appeals recently held, the fact that specific individuals are not the same class members who earlier raised objections does not mean second-in-time class members must be accorded their own opportunity to litigate an issue personally. *See In re Diet Drugs Prods. Liab. Litig.*, 431 F.3d 141, 147 (3d Cir.2005). "If this argument were to be accepted, each class member would be able to relitigate each issue, rendering the class action mechanism pointless." *Id.* Thus, for purposes of

our analysis, it matters only that the issue of subject matter jurisdiction was litigated, not that these particular movants did so.

Since subject matter jurisdiction was actually litigated prior to the entry of PTO No. 1415, any further challenge on that ground could only have been made on direct appeal and may not be raised collaterally through movants' Rule 60(b) motion. Consequently, we reject movants' contention that PTO No. 1415 is void due to a lack of subject matter jurisdiction.

**IV.**

Movants further contend they are entitled to relief from the August 28, 2000 judgment because (1) the notice given the class was insufficient to confer personal jurisdiction over all absent class members and (2) the representation provided by Class Counsel was inadequate. According to movants, under either scenario PTO No. 1415 approving the Settlement Agreement is void as violative of the class members' due process rights.

The Supreme Court has had several occasions to consider the procedural requirements that must be satisfied in order to bind otherwise absent parties to a particular judgment. In *Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940), the Court was faced with the question whether defendants who were absent from an earlier state court action enforcing a homeowners agreement restricting land use on the basis of race were bound by that judgment. The Court held they were not since under the circumstances defendants were not part of the same class as the other neighboring landowners. In its opinion, the Court explained that due process does not prevent absent class members from being bound by a judgment in a class action except "where it cannot be said that the procedure adopted, fairly insures the protection of the interests of absent parties who are to be bound by it."

*Id.* at 42, 61 S.Ct. 115. The Court declared that it was well established that absent class members are bound by judgments where "they are in fact adequately represented by parties who are present." *Id.* at 43, 61 S.Ct. 115. Due process is satisfied as long as "the procedure were so devised and applied as to insure that those present are of the same class as those absent and that the litigation is so conducted as to insure the full and fair consideration of the common issue." *Id.* As the Supreme Court later ruled in *Mullane v. Central Hanover Bank & Trust Co.*, due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Due process mandates that "within the limits of practicability notice must be such as is reasonably calculated to reach interested parties." *Id.* at 318, 70 S.Ct. 652.

In *Phillips Petroleum Co. v. Shutts*, relying on *Hansberry* and *Mullane*, the Supreme Court squarely addressed the requirements of due process in a class action, albeit one brought in a state court. *See* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). The *Shutts* class was comprised of a nationwide group of approximately 33,000 individuals or entities seeking to recover interest on royalty payments that had been improperly withheld by the defendant gas producer and manufacturer. There, the Supreme Court held that in order to bind absent class members to a judgment, they must be given "minimal procedural due process protection" consisting of the "best practi-

cable" notice, concomitant right to opt-out, and adequate representation from the named plaintiff. *Id.* at 812–13, 105 S.Ct. 2965.

In a recent decision in this very class action, the Court of Appeals explained that "where opt out rights are afforded, [due process] protections are adequate representation by the class representatives, notice of the class proceedings, and the opportunity to be heard and participate in the class proceedings." *In re Diet Drugs,* 431 F.3d at 145.

We first note the distribution plan for the notice to class members was a spectacular success story. As Judge Bechtle found, the use of direct mail to diet drug users, pharmacists and physicians was combined with a media avalanche involving television network and cable advertising, newspaper and magazine print advertising directed at both diet drug users and healthcare providers, the Internet, and news coverage regarding the effects of fen-phen on the heart in an effort that proved extremely effective at reaching its intended audience. *See* PTO No. 1415 at 80–85. At the fairness hearing, the court heard testimony from Elizabeth Krupnick, an expert in communications. *See id.* at 83. When all was said and done, the court found that the settlement message reached 97% of women 35 years and older an average of 11.4 times, and 94% of men between the ages of 25 and 54 an average of 6.2 times. *Id.* at 83 n. 16. The distribution of the notice clearly met the Supreme Court's mandate in *Mullane* that "within the limits of practicability notice must be such as is reasonably calculated to reach interested parties." 339 U.S. at 318, 70 S.Ct. 652.[11]

**11.** We note that movants do not contend in their briefs that the dissemination plan was inadequate to distribute notice to the approximate 6 million class members. Indeed, no movant alleged that he or she did not receive notice of the Settlement Agreement. At oral argument, movants presented certain evi-

dence regarding the number of notice packets actually distributed. They argued that because far fewer class members registered with the Trust than actually received notice, the content of the notice *must* have been deficient in explaining (1) the nature of the potentially

■ Movants argue the content of the notice provided class members regarding the Settlement Agreement violated due process because it "failed to apprise class members of basic information necessary to reach an informed decision whether to remain subject to the Court's jurisdiction or whether to opt-out." Notice is the mechanism by which a court asserts jurisdiction in a class action over absent class members otherwise beyond its reach. *See In re Prudential Ins. Co. Sales Practices Litig.*, 148 F.3d 283, 306 (3d Cir.1998) (citing *Shutts*, 472 U.S. at 811–12, 105 S.Ct. 2965). Accordingly, if the notice were constitutionally insufficient, the court never could have acquired personal jurisdiction over absent class members. Movants maintain not only that PTO No. 1415 violated their due process rights but that "all subsequent proceedings pertaining to the settlement are devoid of validity." *Greenfield v. Villager Indus., Inc.*, 483 F.2d 824, 834 (3d Cir.1973).

The due process notice requirements of *Mullane* and *Shutts* are codified in Rule 23. That rule, as it existed in 2000, contained two distinct notice provisions: subsection (c)(2) required that class members be given "the best notice practicable under the circumstances" and subsection (e) required all members of the class be notified of the terms of any proposed settlement.[12] *See* Fed.R.Civ.P. 23. Our Court of Appeals has dealt with the content of the notice of settlement class actions in *In re Prudential*. There, the court affirmed the notice of a class action settlement involving a class of 8 million securities purchasers as having satisfied due process. The notice

included: (1) explanations of the procedures for opting out, entering an appearance, and filing objections; (2) notification that if class members did not opt out of the class they would be bound by the settlement if approved; (3) an overview of the claims resolution process and basic claim relief available to the class; (4) the text of the release; (5) notification that all related documents were available for public inspection; and (6) an explanation of the nature of the claims covered under the settlement and an 800 number through which class members could obtain information and make further inquiries. *See In re Prudential*, 148 F.3d at 328; *see also* Fed. R.Civ.P. 23(c)(2).

The notice provided to class members here was extremely thorough. *See* PTO No. 1415 at 79; PTO No. 997 at ¶ 15 (Nov. 23, 1999). Indeed, as Judge Bechtle explained:

> The notice program had two essential parts. The first part of the notice program was designed to make class members aware of the potential risks posed by Pondimin and Redux, of the legal rights arising from the use of those drugs, of the proposed nationwide class action settlement which would resolve such claims and of their opportunity to opt out or object to the Settlement. In addition, the first part of the notice program was designed to inform class members of the opportunity to obtain a court authorized "notice package" describing their legal rights in relation to the settlement by registering to receive the notice package through a 1–800 number

---

severe health effects of diet drug consumption and (2) the effects of the settlement on barring future claims. We find this argument to be speculative and without merit.

**12.** Subsection (c)(2) also required that the notice indicate an opportunity to opt out, that the judgment will bind all class members who

do not opt out, and that any member who does not opt out may appear through counsel. *See* Fed.R.Civ.P. 23(c)(2). The notice provisions of the rule were amended in 2003, but those revisions are not relevant to our inquiry today concerning the adequacy of notice at the time PTO No. 1415 was entered in August, 2000.

(1–800–386–2070) or through the world wide web (www.settlementdiet-drugs.com). The second part of the notice program was to provide a detailed "notice package" to each person who had registered through the 1–800 number or web site and to all other class members whose names and addresses were known to the parties.

PTO No. 1415 at 79–80.

The notice itself consisted of several important elements, set forth in detail in PTO No. 1415:

> The first component of the notice was a colorful brochure entitled "A Class Member's Guide to Settlement Benefits." It was designed to describe the background of the Diet Drug Litigation and the Settlement Agreement in a way that would be read and understood by all class members. Towards this end, it was written in plain English and contained a number of pictures, charts and graphs. (Exs. P–211, P–42 & P–34.) The next element of the notice package was the Official Court Notice of the nationwide Diet Drug Class Action Settlement. This "official notice" contained a detailed description of the Settlement Agreement, typeset in the manner traditionally used to provide legal notice. (Exs. P–211, P–54 & P–35.)

> The notice package also included a PINK FORM that class members were required to complete if they elected [Accelerated Implementation Option] benefits. The deadline for completing the PINK FORM was either the date on which Final Judicial Approval was obtained or the date on which it was determined that Final Judicial Approval would not be obtained. (Exs. P–211, P–44 & P–33.) The notice package also contained a BLUE FORM that class members were required to complete in order to register to receive settlement benefits in the event that the settlement received Final Judicial Approval. The deadline for completing the BLUE FORM was open-ended. (Exs. P–211, P–24, P–46 & P–38.) The notice package also contained a GREEN FORM that class members and physicians were required to complete in order for class members to obtain Matrix Compensation Benefits now or in the future. This form included a comprehensive guide to Matrix Compensation Benefits to assist class members in completing the form and understanding class members' rights to Matrix Compensation Benefits. This guide contained quotations and illustrations from standard medical texts which were used to define the concepts relevant to a determination of Matrix Compensation Benefits. (Exs. P–211, P–45 & P–22.)

> The notice package also contained a simple one page ORANGE FORM that class members could complete to exercise their initial opt-out rights. In the alternative, class members could exercise an initial opt-out right by transmitting any written manifestation of their intent to do so to the Interim Claims Administrators. (Exs. P–211, P–43 & P–9.) The court directed that class members be given the right to opt-out by March 30, 2000, which was 120 days from the date that class notice commenced. (Pretrial Order No. 997 ¶ 11; Ex. P–31 ¶ 2.) Finally, the notice package contained a postage-prepaid business reply envelope that class members could use to return the relevant forms. (Exs. P–211 & P–48.)

> The notice packages were not the only source of information concerning the settlement. The Interim Claims Administrators employed the Official Settlement Website to post answers to frequently asked questions about the settlement, to reply to questions submitted via E-mail, to provide a news

letter regarding the settlement, and to otherwise communicate with class members concerning the settlement. In addition, the Interim Claims Administrators established a separate 1–800 number and provided staff to answer questions submitted via telephone concerning the settlement. (Tr. 5/9/00 at 32–34 & 37–38.)

PTO No. 1415 at 85–87.

According to movants, the notice failed to advise the diet drug class members that: (1) the promised benefits might be reduced; (2) the stated procedures for handling claims might be altered; and (3) the class included large numbers of people over which the court lacked subject matter jurisdiction. Movants maintain that as a result of these deficiencies the notice falls short of satisfying the Fifth Amendment's Due Process Clause.

It cannot be gainsaid that Judge Bechtle gave careful consideration to the notice plan as explained in PTO No. 1415. The court engaged in a lengthy analysis of the legal sufficiency of the above-described notice under the applicable standards including due process and found the notice program both satisfied the "best notice practicable" requirement and was sufficient to warrant the court's exercise of personal jurisdiction over the class pursuant to In re Prudential. See PTO No. 1415 at 89 (citing Shutts, 472 U.S. at 812, 105 S.Ct. 2965; In re Prudential, 148 F.3d at 306). Moreover, because the diet drugs were only available through a physician's prescription and had to be consciously ingested, there were no class members "unwittingly exposed" as occurred in Amchem Products, Inc. v. Windsor, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). PTO No. 1415 at 88–89.

 Movants argue that the content of the notice was deficient in that it failed to warn that class members might possibly face reduction in the value of their claims or non-payment. The notice clearly stated that Wyeth was obligated to pay into the settlement funds "as much as $4.83 billion (present value $3.75 billion)." See Official Court Notice at 8–9. The adequacy of funding for the settlement was one of the central issues considered by the court in approving the class action Settlement Agreement. Indeed, all of the experts who testified on the issue at the fairness hearing agreed that the Trust would have sufficient funds to pay the prescribed benefits. See PTO No. 1415 at 62–66. "No evidence was offered at the Fairness Hearing suggesting that the amounts to be paid into Fund A or Fund B are, or are likely to become, inadequate to pay for the benefits to be provided under the Settlement." Id. at 66. All parties acted reasonably and cannot be faulted for not anticipating any future funding problems in light of the testimony at the fairness hearing and the enormous sum to be paid by Wyeth. The parties cannot legitimately be second-guessed under the circumstances for failing to include such a warning in the class action notice. We must analyze the parties' conduct at the time the settlement was approved and not from twenty-twenty hindsight. We do not see how the notice could be found to violate due process when it failed to include what, at that time, could only have been conjecture. Quite simply, predicting future events outside the reasonable contemplation of all the parties and the court was not required. See, e.g., Shutts, 472 U.S. at 812–13, 105 S.Ct. 2965; In re Prudential, 148 F.3d at 306.

In any event, even if this possible inadequacy of funds should have been foreseen, no class member as of this time has received a reduced benefit or had his or her benefit eliminated because of any inadequacy. As explained more fully above, it was only after several years following approval of the Settlement Agreement that

the possibility of a shortfall at the Settlement Trust was discerned. As a result, the Seventh Amendment came into being. With Wyeth's additional infusion of $1.275 billion to pay class members, the Seventh Amendment remedied any deficiency before it could become a reality. Class members were given the opportunity to opt out of the Seventh Amendment and remain as claimants under the original Settlement Trust. Only 6,959 class members did so, and only 2,540 class members now remain who seek matrix benefits from the Trust's current balance of over $1.4 billion. Again, no one argues that there are now insufficient Trust funds to pay the remaining class members. Absent any "present or immediate injury," we do not see how movants can claim either standing or ripeness of any grievance in this regard. *See Shutts*, 472 U.S. at 804, 105 S.Ct. 2965. Any contention concerning lack of notice about the possible lack of funds for benefits from the Settlement Trust is simply speculative.

■■■ Movants also maintain that the notice was inconsistent with due process because it did not explain that "the procedural elements represented to provide prompt adjudication could be altered." While movants do not articulate which "procedural elements" have adversely affected their rights under the Settlement Agreement, it appears that they are unhappy with the 100% audit requirement ordered by PTO No. 2662 on November 26, 2002. In that order, after reviewing a troubling record of possible fraud before the court, we required audits of 100% of matrix claims to ensure that only legitimate claims would be paid. We did so pursuant to our authority under § VI.E.8 of the Settlement Agreement for "good cause shown."

Our Court of Appeals has directed that notice is required to *"summarize* the litigation and the settlement." *In re Pruden-*

*tial,* 148 F.3d at 327 (emphasis added). The purpose is to "provide [class members] with the information 'needed to decide, intelligently, whether to stay in or opt out.'" *In re Diet Drugs Prods. Liab. Litig.,* 385 F.3d 386, 395 (3d Cir.2004) (quoting *Amchem,* 521 U.S. at 628, 117 S.Ct. 2231). Any reasonable class member receiving the notice would have assumed without a detailed recitation that the court would take appropriate procedural and substantive steps to prevent fraud and to protect the integrity of the claims process. For example, it is hard to imagine that any *legitimate* claimant would have opted out of the settlement had the notice specified that the court intended to take whatever action was necessary, consistent with the terms of the Settlement Agreement, to preclude fraud or otherwise meritless claims.

■■■ Movants also seem to complain that no notice was provided about possible delays in the payment of benefits. While unfortunate delays have occurred due to unforeseen events, the failure to have speculated in the notice about such possibilities cannot be said to violate due process. There was no meaningful way to advise class members, who had to decide whether or not to opt out of the Settlement Agreement and sue in the tort system, which path would be more expeditious. It goes without saying that significant delays often occur in lawsuits especially if the case is tried and an appeal is taken.

■■■ Even if due process required that the notice provide specific information about the procedure for the adjudication, we find that the necessary content was included. The notice clearly stated that class members would have to "apply" for benefits to be determined by a "Proof of Claim Procedure." *See* Official Court Notice at 14. The notice referred class members to the Settlement Agreement. Of

course, the Settlement Agreement made clear that all provisions of the agreement were subject to the exclusive and continuing jurisdiction of this court and that we could order additional audits and adopt additional claims administration procedures for "good cause shown." Settlement Agreement § VI.E.8. In sum, the notice did not transgress due process with respect to any failure to disclose procedures for adjudicating claims.

 Movants finally contend that the notice was deficient because it failed to apprise class members that the class included large numbers of people over whose claims the court lacked subject matter jurisdiction. This is likewise without merit. As discussed above, the court properly asserted subject matter jurisdiction over all claims in the class. Movants' attempt to bootstrap their subject matter jurisdiction argument to their allegation of defective notice to obtain yet another bite at the jurisdictional apple must be rejected. *See In re Diet Drugs*, 431 F.3d at 146.

Consequently, we find the notice of the Settlement Agreement provided to the class members satisfied the Due Process Clause of the Fifth Amendment in all respects, and there is no basis for granting movants relief from judgment on this ground under Rule 60(b)(4).

 In addition to the deficiency in the content of the class notice, movants assert that the due process rights of the class members were infringed because the class was provided with inadequate representation by Class Counsel back in 2000. Movants challenge the adequacy of representation in two ways. First, they argue that the universe of diet drug recipients lacked the necessary cohesiveness or common questions of law or fact. According to movants, no class counsel under the circumstances could possibly have adequately represented the interests of the class. In essence, movants contend that the class

contained such intramural conflicts that it could not be represented consistent with the requirements of *Hansberry* and *Shutts*. Furthermore, movants submit that Class Counsel failed in its representation because: (1) Class Counsel chose not to inform the court of evidence from its own expert that diet drug-induced VHD is a latent disease; and (2) Class Counsel failed to detect massive undercounting of potential matrix claims by the class expert. Movants' arguments about the class certification are not new. In fact, many of these arguments were made in nearly identical form and were rejected by Judge Bechtle in PTO No. 1415. Nevertheless, we will address them again for any constitutional inadequacies in the context of this 60(b)(4) motion. *See In re Diet Drugs*, 385 F.3d at 396.

As we previously stated in PTO No. 2929, "adequate representation must be viewed as of the time of settlement, not as of some point thereafter." PTO No. 2929 at 11 (Jul. 22, 2003) (citing *Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 985–86 (7th Cir.2002)). Thus, subsequent developments in the more than five years since PTO No. 1415 was decided cannot affect our analysis of whether the court committed constitutional error in deciding that Class Counsel could properly represent the class. We must travel back in time to revisit the decision based on the facts as known in 2000.

Our Court of Appeals has explained that the due process requirement of adequate representation, as articulated by the Supreme Court in *Hansberry*, "is codified" in Rule 23(a)(4). *In re Diet Drugs*, 431 F.3d at 145. That rule requires that class representatives and their counsel "will fairly and adequately protect the interests of the class." *See* Fed.R.Civ.P. 23(a)(4). Movants' due process argument consists mainly in citing a plethora of cases from courts

across the country that federal courts should never permit the use of the class-action device in mass-tort cases.[13] Whatever the merits of these decisions, this issue was thoroughly litigated before Judge Bechtle and never.raised on direct appeal. Judge Bechtle found in PTO No. 1415 that the requirements of Rule 23(a)(4) were satisfied because Class Counsel as well as subclass counsel were highly qualified to represent the class and all absent class members' rights were ensured adequate protection. *See* PTO No. 1415 at 99–123. There was clearly no usurpation of power so as to void a judgment under Rule 60(b)(4). *See Marshall,* 575 F.2d at 422.

We reject all of movants' arguments that the possible variances between different claimants affect the viability of settlement in this case. Under the Settlement Agreement, benefits depend on the medical condition of class members as certified by their own physicians. The Supreme Court made clear in *Amchem* that the terms of a proposed settlement should be taken into consideration when determining whether the requirements of Rule 23 are met. 521 U.S. at 619–20, 117 S.Ct. 2231. We are convinced, as was Judge Bechtle, that the establishment of the clear and objective medical criteria to determine payment of benefits under the Settlement Agreement adequately addressed the differences among the conditions of the class members. *See, e.g.,* PTO No. 1415 at 24, 50–51, 97; Settlement Agreement § IV.B.2. Again, no infringement of due process has been shown.

As previously referenced, Judge Bechtle determined that diet drug-induced VHD is not a latent condition. *See* PTO No. 1415 at 41. In *Amchem,* the class could not be adequately represented because asbestos-related diseases are potentially latent for long periods of time. *See* 521 U.S. at 626–27, 117 S.Ct. 2231. This so-called "futures" problem makes adequate representation impossible because of the diametrically opposed interests between presently harmed class members in seeking present-day recovery and class members who may not develop compensable conditions until some future point who would want to preserve resources for that future day. Because PTO No. 1415 found that diet drugs were not latent, this "futures" problem was not present.

Furthermore, the court in PTO No. 1415 explicitly addressed the question of representation under Rule 23(a)(4). Movants do not dispute the court's finding that Class Counsel and Subclass Counsel were eminently qualified. *See* PTO No. 1415 at 100–02. Rather, movants contend that there was a "raft of conflicting interests" undermining the ability of Class Counsel adequately to represent the class. The question of potential conflicts was not ignored by Judge Bechtle. PTO No. 1415 reflects nearly twenty pages of consideration on this point. We see no constitutional basis to depart from Judge Bechtle's well-reasoned decisions that: (1) the class was sufficiently cohesive; (2) there was no evidence of a "futures" problem such as in *Amchem;* (3) there was no conflict regarding the forfeiture of class members to claim neuropsychiatric injuries; (4) there were sufficient structural protections afforded the class; (5) there were no lump sum allocations or financial trade-offs; (6) subclass counsel was adequately involved in the negotiation of the settlement; and (7) the class counsel fee structure was appropriate. *See* PTO No. 1415 at 102–23.

Movants' second argument that the class representation was inadequate relies on two specific decisions made in the course

---

**13.** Movants cite more than 10 circuit court opinions and 40 district court opinions, a listing of which is neither practical nor necessary herein.

of that representation: (1) Class Counsel's failure to inform the court at the fairness hearing of the alleged opinion of James Oury, M.D., that diet drug-induced VHD is a latent disease; and (2) Class Counsel's failure to detect at the fairness hearing an alleged massive undercounting by Samuel Kursh, D.B.A., a forensic economist and the class expert on the number of potential matrix claims. Class Counsel dispute both of these allegations. They argue that this alleged evidence of latency would not have been admissible under the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and that to have presented it would have been professionally irresponsible. Class Counsel further contend that there was no undercounting mistake made by the class expert.

We turn again to the requirements of due process: that class counsel have adequate experience, "vigorously prosecuted the action," and "acted at arm's length from the defendant." *In re Prudential,* 148 F.3d at 313; *In re Gen. Motors Corp.,* 55 F.3d 768, 801 (3d Cir.1995). Movants have alleged, however, that individual decisions by Class Counsel in the course of their representation amounted to either fraud or incompetence such that the class was deprived of constitutionally adequate representation. We find movants' accusations misplaced. We reiterate that it is undisputed that Class Counsel possessed excellent professional qualifications. *See* PTO No. 1415 at 100–02. Further, as Judge Bechtle found, Class Counsel vigorously pursued their representation of the class at all times and negotiated the Settlement Agreement at arm's length from Wyeth. *See, e.g., id.* at 10–13, 102–23. Certainly, Class Counsel must have the right to determine what evidence to introduce and to decide whether any experts they seek to call on latency or any other issue can satisfy the standards of *Daubert.* There is no evidence before the court that

Class Counsel acted in any way inappropriately on the issue of latency so as to void PTO No. 1415. Additionally, the alleged miscounting mistake cannot be said to deprive absent class members of adequate representation. Again, we see no constitutional basis to find that the absent class members' due process rights were violated through inadequate representation by Class Counsel.

## V.

▮ The pending motion for relief from judgment is made pursuant to Rule 60(b)(4). Nonetheless, several of the movants' arguments properly fall under the first three subsections of Rule 60(b), which provide for relief from judgment for: "(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); [or] (3) fraud ... misrepresentation, or other misconduct of an adverse party." *See* Fed.R.Civ.P. 60(b)(1)-(3). Unlike a motion under Rule 60(b)(4), a motion under these subsections must be filed within one year after the judgment is entered.

Movants claim that Dr. Kursh, the class's forensic economist, made mathematical miscalculations in projecting the possible number of diet drug users affected by VHD back in 2000. Class Counsel vehemently argue against this allegation that a mistake was committed, but we need not reach the merits of this issue. The movants are in effect seeking relief from the August 28, 2000 judgment under Rule 60(b)(1) on the grounds of a mistake occurring at the fairness hearing. This effort comes too late. It is time-barred by the one-year limitations period of Rule 60(b).

In addition, movants contend that the court made a mistaken determination in

PTO No. 1415 that echocardiograms could serve as an objective mechanism for determining whether a diet drug user is, in fact, suffering from FDA Positive valvular regurgitation. Significantly, the law firms representing movants herein have repeatedly made nearly identical arguments regarding the "subjectivity" of echocardiography, starting as early as 2002,[14] yet this court has continued to be satisfied by the objectivity of the science. *See* PTO No. 2640 (Nov. 14, 2002). In any event, regardless of movants' due process rhetoric, this attempt for relief from judgment arises under Rule 60(b)(1) and is also out of time.

█ Movants further assert that the determinations in PTO No. 1415 regarding the adequacy of the funds and the objective nature of echocardiography represent "mutual mistakes" among the parties and the court. According to movants, these mutual mistakes must operate to invalidate the Settlement Agreement as they would undermine any basic contract between the parties. Movants' reliance on the doctrine of mutual mistake here is misplaced. That doctrine applies only to known facts that existed at the time the contract was executed and it is well established that "erroneous predictions of future events do not qualify as a mistake." *See Consol. Rail Corp. v. Portlight, Inc.*, 188 F.3d 93, 96, 97 (3d Cir.1999). In any event, all issues relating to mistake must be made within one year after the judgment is entered.

█ We turn for one final time to the latency issue. Movants' several arguments regarding the latent effects of diet drugs in causing VHD properly arise under Rule 60(b)(2) for newly discovered evidence or under Rule 60(b)(3) for fraud, not under Rule 60(b)(4). As explained above, in PTO No. 1415, the court made specific findings of fact that diet drug-induced VHD is not a latent condition. This means that the nature and extent of the diet drugs-related damage is detectable through an echocardiogram shortly after the discontinuation of the drug use. *See* PTO No. 1415 at 105–08. The court found that the available science demonstrated no risk that a diet drug patient who received a clean bill of health from an echocardiogram shortly after discontinuing the drugs would develop diet drug-induced VHD at some future point in time. This finding was crucial to the court's certification of the class because it eliminated the so-called "futures" problem that served to undermine other mass tort class actions like the asbestos class in *Amchem*, 521 U.S. at 628, 117 S.Ct. 2231, where the condition of future plaintiffs could go undetected for many years. *See* PTO No. 1415 at 105. Objectors at the fairness hearing in 2000 offered no scientific evidence to rebut the experts presented by Class Counsel. *Id.* at 107.

In the first of their latency-based attacks in their 60(b) motion, movants maintain that it was inappropriate for Class Counsel to withhold the testimony of purported expert Dr. Oury at the fairness hearing.[15] Dr. Oury, they allege, should have been called to testify about his latency opinions at the fairness hearing for the Settlement Agreement in May, 2000, and Class Counsel perpetrated a fraud on the court and on the class in failing to do so. Class Counsel vehemently deny such charges. As noted above, they counter

14. *See* Napoli/Hariton Post–Hearing Memorandum of Law, at 21 (Sept. 30, 2002).

15. Movants have submitted an affidavit of Dr. Oury to this effect. Dr. Oury states that he has held his opinions regarding the potential latency of the diet drugs "since before the deposition I gave for the Multi–District Litigation on or about June 18, 1999" and that had he been called to testify, he "would have shared these same opinions with the Court."

that Dr. Oury's proposed testimony on the topic of latency did not pass muster under *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786, and that it would have been professionally irresponsible to bring such improper evidence before the court. To the extent that movants allege fraud, it is time barred under Rule 60(b)(3).

To the extent movants claim that scientific evidence of latency is new evidence, we reject it. Dr. Oury was listed as a Plaintiffs' Management Committee ("PMC") generic expert, and his 1999 deposition testimony was part of the record and available in MDL 1203 before the Class Action fairness hearing in May, 2000. His recent affidavit confirms that he held his opinion concerning latency since at least 1999. Thus, his testimony has been available to class members for years. *See* Tr. of Oral Argument at 106–07, 140 (Dec. 13, 2005). Evidence which movants have had available since 1999 is clearly not "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial...." *See* Fed. R.Civ.P. 60(b)(2). Moreover, movants' argument is out of time under the one year filing requirement.[16]

## VI.

This Multi–District Litigation No. 1203 and the administration of the Nationwide Class Action Settlement have indeed been monumental undertakings for all concerned. Over the years, the court has been faced with countless motions and hearings and has entered over six thousand pretrial orders to date. While events have not always gone smoothly, it is significant that over $1.6 billion in matrix benefits have already been paid to class members through the Settlement Trust.

Movants are making a frontal assault on the judgment entered in August 28, 2000, which approved the Class Action Settlement Agreement for the benefit of hundreds of thousands of individuals who have suffered from the ingestion of Pondimin and/or Redux. Movants seek to undo the bargain made between Wyeth and the Class representatives and sanctioned by this court over five years ago. Since that time, all parties and class members have relied on the terms of the Settlement Agreement and its court-approved amendments.

■ This is not the first due process attack on the settlement advanced by certain class members and not the first advanced by some of the law firms representing movants here. It is merely the latest effort to sow uncertainty and cause unacceptable delay and confusion to the severe detriment of class members. As our Court of Appeals cogently stated in an earlier appeal in this case, "Class members are not, however, entitled to unlimited attacks on the class settlement. Once a court has decided that the due process protections did occur for a particular class member or group of class members, the issue may not be relitigated." *In re Diet Drugs*, 431 F.3d at 146. Wisely, Rule 60(b)(4) recognizes the importance of finality and does not allow a party to obtain relief from judgment unless there has been a violation of due process or a clear usurpation of power. *See Marshall*, 575 F.2d at 422. Whatever judicial or other errors there may have been along the way, no constitutional violations have occurred. Consequently, the motion under Rule 60(b)(4) is being denied.

**16.** At the oral argument on the pending 60(b) motion, movants' counsel indicated their intention to file a motion seeking a hearing on the present day science regarding the latency of diet drug-induced VHD. Movants never filed such a motion.

*PRETRIAL ORDER NO.*

AND NOW, this 8th day of March, 2006, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that the motion of certain class members for relief from judgment under Rule 60(b)(4) of the Federal Rules of Civil Procedure is DENIED.